78 A.3d 415

Jamar HOLT

v.

STATE of Maryland.

No. 98, Sept. Term, 2012.

Court of Appeals of Maryland.

Oct. 28, 2013.

444

446

Kenneth W. Ravenell (Milin Chun, Murphy, Falcon & Murphy, Baltimore, MD), on brief, for petitioner.

Thiruvendran Vignarajah, Special Asst. Atty. Gen. (Carrie J. Williams, Asst. Atty. Gen., Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Submitted before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, and ALAN M. WILNER (Retired, Specially Assigned), JJ.

BARBERA, C.J.

It is settled that a law enforcement officer may conduct an investigatory stop of an individual if the officer has a reasonable suspicion that criminal activity is afoot. *See Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion is not a demanding standard, but it does require more than an "unparticularized suspicion or hunch." *Id.* at 27, 88 S.Ct. 1868 (internal quotations omitted). In the present case, we must determine whether two Baltimore City detectives had a valid basis to conduct an investigatory stop of Petitioner Jamar Holt.[1] For the reasons that follow, we hold that they did.

## I.

### *The Suppression Hearing*

Baltimore City Police Department Detectives Joseph Crystal and James McShane were the only witnesses at a hearing to determine whether Petitioner was entitled to suppression of the detectives' observations during and immediately following the investigatory stop of Petitioner. The suppression court received evidence through the testimony of the detectives and written statements by the detectives.

During the summer of 2011, the Violent Crime Impact Section ("VCIS") of the Police Department was investigating Daniel Blue, who was known for distributing raw heroin in Baltimore City. On June 29, 2011, VCIS conducted surveil-

---

1. The caption of the Court of Special Appeals' opinion in this case refers to Petitioner as "Jamar Holt A/K/A Jamal Holt." In his filings in this Court, Petitioner refers to himself as "Jamar Holt."

lance of a meeting between Blue and an individual named Claude Townsend on a street corner in Baltimore City. Detectives Crystal and McShane were part of the June 29 surveillance. Although the detectives did not observe the meeting between Blue and Townsend, they were on the arrest team. The meeting, however, was captured by a Baltimore City surveillance camera, and the detectives testified about the meeting based on their review of the surveillance video.

Blue arrived at the June 29 meeting in his vehicle and, after exiting the vehicle, looked around in what Detective Crystal characterized as "a nervous manner." Blue then walked toward Townsend, took an object out of his left pocket, and handed the object to Townsend. Townsend placed the object in his left pocket. Shortly thereafter, Blue returned to his vehicle and "quickly drove out of the area." The meeting between Blue and Townsend lasted approximately two minutes. Detective Crystal testified that Blue looked around during the entire meeting.

After Blue left the scene, Townsend walked toward his house. As he approached his house, a member of VCIS arrested him. The VCIS arrest team recovered from Townsend's left pocket a plastic bag containing a piece of bread stuffed with suspected raw heroin.

VCIS next conducted surveillance of Blue on July 13, 2011. Detectives Crystal and McShane, along with another VCIS detective, were part of the surveillance team. The day before the surveillance, Detective Crystal reviewed the video of the June 29 drug transaction between Blue and Townsend[2] "to ascertain ... what [Blue] looked like, his mannerisms, if he was right-handed, if he was left-handed, [and] the way he dressed." Detective McShane reviewed the same video "numerous times" before July 13 "to familiarize [him]self with Mr. Blue's actions."

---

2. Although the record does not reflect whether Blue or Townsend was convicted of having engaged in a drug transaction, Petitioner in his brief assumes that a drug transaction took place. For the purposes of our analysis, we shall do the same.

On July 13, at approximately 9:00 a.m., Blue arrived at the Baltimore City District Court on North Avenue for a court appearance.[3] While he was inside the courthouse, Detective Crystal placed a GPS tracking device on Blue's vehicle. Blue eventually exited the courthouse and returned to his vehicle. During the surveillance at the courthouse, Detective Crystal did not observe Blue look around.

After the court appearance, the detectives followed Blue to an apartment building in White Marsh, Baltimore County, and Detective McShane observed him enter an apartment. Approximately five minutes later, Blue exited the apartment carrying a Rubbermaid container in his hand. Detective McShane testified that the container was "the size of a sandwich." Blue then drove directly to Lake Montebello in Baltimore City.

The detectives testified that Blue arrived at Lake Montebello and parked his vehicle near a workout station. He then exited the vehicle and walked toward the workout station, next to which stood Petitioner. According to Detective McShane, Petitioner did not appear nervous as he waited for Blue. Blue, on the other hand, "looked around in a nervous manner": he "look[ed] over both of his shoulders," "look[ed] around the area," and "look[ed] at cars that were passing by."

When Blue reached Petitioner, the men shook hands and walked toward a black Jeep Cherokee. Petitioner entered the Jeep on the driver's side and Blue entered on the passenger's side. Petitioner then drove one loop around Lake Montebello and stopped the Jeep near Blue's parked vehicle. The entire meeting between Blue and Petitioner lasted approximately two minutes.

Blue exited the Jeep and walked toward his vehicle. Detective Crystal testified that, as Blue walked toward his vehicle, he was "still kind of looking ... around in the same type of

---

**3.** Detective Crystal testified that Blue "had court at the North Avenue Courthouse for Domestic Court."

way that he was [in] the video" of the drug transaction with Townsend.

Petitioner and Blue exited Lake Montebello in separate vehicles. Detective McShane, as lead detective, decided that he and Detective Crystal would follow Petitioner. Detective Crystal testified that, at this point:

> We had believed that there may have been a drug transaction that transpired between the two of them. But we weren't—again, we weren't sure, and we wanted to see—possibly identify who [Blue] had just met with. We wanted to see where that individual may go, if he may meet with somebody else. So anything that could maybe help us further our investigation into ... Blue.

Detective Crystal testified that there were several reasons why the detectives suspected that Petitioner "may have" committed a drug-related crime: (1) he met with Blue, who distributed raw heroin two weeks earlier; (2) Blue looked around throughout the meeting with Petitioner, just as he had looked around throughout the drug transaction; and (3) the meeting with Petitioner lasted approximately the same amount of time as the drug transaction.

Detectives Crystal and McShane followed Petitioner's vehicle out of Lake Montebello and continued to follow the vehicle for "a few brief minutes." After that short time, both detectives activated the lights on their unmarked vehicles, indicating to Petitioner that he should pull over. Detective Crystal testified that the detectives pulled over Petitioner because they wanted to identify the individual who may have engaged in a drug transaction with a known drug dealer. Detective Crystal further testified that Petitioner had not made a complete stop at a stop sign and Detective McShane added that Petitioner had been driving "over the speed limit."

Petitioner pulled over his vehicle in the 1400 block of Fillmore Street. The detectives approached Petitioner's vehicle on foot—Detective McShane from the front and Detective Crystal from the rear—and identified themselves as "police." As Detective Crystal approached, he noticed that the brake

light on Petitioner's vehicle was still on, indicating that Petitioner had not placed his vehicle in "park." As Detective McShane approached, he yelled several times, "Police, let me see your hands."

Shortly thereafter, Detective Crystal observed Petitioner take "his right hand off the steering wheel," "move[ ] it down out of [the detective's] sight," and "then quickly raise[ ] his right hand and point[ ] a handgun directly at Detective McShane." After Detective Crystal alerted Detective McShane that Petitioner had a gun, Petitioner drove his vehicle in Detective McShane's direction. As Petitioner's vehicle headed toward Detective McShane, both detectives fired their guns at Petitioner. Petitioner fled the scene in his vehicle, missing Detective McShane.

The police arrested Petitioner when he checked himself into the University of Maryland Hospital with gunshot wounds. The record does not reflect when or where, but at some point, the police found Petitioner's vehicle. The police did not find in the vehicle the gun Detective Crystal had observed in Petitioner's hand or any other physical evidence that the State intended to offer at trial.

The State ultimately charged Petitioner with assault, reckless endangerment, firearms violations, and a drug-related offense.[4] Petitioner, through counsel, sought suppression of the detectives' observations during and immediately following the investigatory stop of Petitioner—including any observations of a gun—on the ground that the investigatory stop violated the Fourth Amendment. The court heard argument of counsel and ruled that the investigatory stop of Petitioner violated the Fourth Amendment because the detectives did not have reasonable suspicion that Petitioner had committed a drug-related crime, nor, the court found as a fact, had they observed him commit a traffic violation.

---

4. Detective Beard, the third VCIS detective on the surveillance team, arrested Blue shortly after his meeting with Petitioner. The State charged him with, among other things, unlawful distribution of a controlled substance based on his drug transaction with Townsend.

With the exception of its factual finding that the detectives had not observed Petitioner violate any traffic law, the suppression court found the detectives to have been credible witnesses:

> I am impressed by the detectives. I don't see them here, so I'm going to say it again, I am very impressed by their candor with the Court. Especially Detective Crystal. I think he was being honest and truthful and forthright. I think he was clear about what he was doing, and why he was doing it. And for that I greatly appreciate the testimony.

With respect to Detective McShane, the suppression court stated, "I think up to [the] point [when Detective McShane testified that Petitioner committed traffic violations] Detective McShane was being very honest and truthful with the Court."

The court then explained its ruling as to the lawfulness of the detectives' stop of Petitioner:

> First, there was a seizure of Mr. Holt's car within the meaning of the Fourth Amendment. His vehicle was forcibly stopped by law enforcement on July 13th.... Even though the stop was limited, ... it doesn't have to be a long stop, and it doesn't have to be a long detention, in order to trigger the Fourth Amendment.
>
> \* \* \*
>
> There was no reasonable suspicion to justify an investigatory stop of Mr. Holt's vehicle. They wanted to stop it, they had a hunch, but I do not find that the purpose of that stop was for anything more than to find out who the driver of the vehicle was, and see if they couldn't search the vehicle to find drugs. That's what they wanted to do.
>
> \* \* \*
>
> [T]here's no reasonable suspicion for an investigatory stop. Not reasonable. That there were a bunch of innocuous facts, some have absolutely nothing to do with Mr. Holt, even though[ ] the police would like to pile it on and make it appear that it has something to do with Mr. Holt, it doesn't.

Had the packaging been similar, had there been a call from Mr. Holt, had there been an observation of an exchange, had there been some way that Mr. Holt was involved in this enterprise, some evidence of it before the meeting at Lake Montebello. But there are too many innocent, innocuous facts.

These innocent facts are going to Montebello where people work out. Taking your lunch with you, which is what is normally [done]. There's no evidence that drugs in Baltimore when [they are] in large quantities are contained in Rubbermaid containers. There's no evidence that the officers previously observed Mr. Blue to put all his drugs in . . . Rubbermaid containers. There's no evidence that there was a container taken out [of] Mr. Blue's car, and placed into Mr. Holt's car.

There's no connection between Mr. Holt and drug activities of Mr. Blue that go back, at least to June 29th, none at all. They don't exist. It's not in this case. And it's a figment of the State's imagination. And the detectives. They wanted that to be the case, but there was no evidence of it. Their instincts and hunches and the hairs on the back of their necks were raised, but that does not make reasonable suspicion. So there was none.

\*　　\*　　\*

So let's look at the traffic violation. . . . I don't think [the traffic violation] was the reason [for the stop]. I think it was an investigatory stop, without reasonable suspicion. I don't think there was a traffic violation. And because I don't believe that there was a traffic violation there's a problem.

\*　　\*　　\*

Which is why I grant your motion. The stop was unlawful. It was unreasonable. It was in violation of Mr. Holt's Fourth Amendment Constitutional right. He was seized on a hunch. And that makes it unlawful. . . . I believe the officers wanted to find out who the driver of the vehicle was, they wanted to do it quickly, and they wanted to get back to

Mr. Blue. They figured they'd find out, maybe [there are] the drugs sitting on the seat, they'll detain him, they'll recover the drugs, and that will be the end of the story. And that's my ruling.

The suppression court, having determined that the detectives did not have reasonable suspicion to stop Petitioner, ruled inadmissible any testimony related to Detective Crystal's observation of a gun.

The court then allowed argument on Petitioner's request to suppress any other observations by the detectives during and immediately following the investigatory stop, including the detectives' observation that Petitioner drove his vehicle toward Detective McShane. The State argued that, even if the stop of Petitioner was illegal, Petitioner committed "[t]he new crime [of] assaulting a police officer," and that new crime "purges the taint of the unlawful stop." As to that argument, the court ruled:

> [T]he gun and the observations of the weapon are gone. That is the sanction for the illegal stop of that vehicle.
>
> \*　　\*　　\*
>
> However, all other observations the Court is finding that there is a series of separate crimes that occurred following the initial stop, which includes the movement of the vehicle towards the ... officers.... And any crime that the State can prove by that action they are free to proceed with because I believe that there is an attenuation of any taint for any actions that occurred subsequent to that initial stop.
>
> \*　　\*　　\*
>
> [A]lthough the officers acted unlawfully, ... [t]hat does not open the door for any type of unreasonable illegality, which would include any criminal conduct that could cause harm to anyone, including police officers.
>
> Just because you are the subject of an illegal stop does not, per se, give you the license to commit any type of crime towards the individuals who may have stopped you illegally.
>
> \*　　\*　　\*

As it turns out, the gun is so connected and intertwined with the actions of the officers that the statement "let me see your hands" was an officer's direction to the defendant. And that direction resulted in him doing something. . . . And that is a direct flow from the initial stop, which was illegal. . . . Let me see your hands. Yeah, well, what you see is the gun. Suppressed.

But after that the decision of the defendant to then take certain actions of his own initiative, different crime, different event, the taint is attenuated . . . and therefore the Court will allow the State to enter any evidence of an assault by the use of the vehicle. . . .

The State filed a motion for reconsideration of the court's ruling to suppress Detective Crystal's observation of a gun. The suppression court denied that motion for essentially the same reasons the court had stated on the record at the suppression hearing.

### The Appeal

The State filed an interlocutory appeal to the Court of Special Appeals, pursuant to Maryland Code (1973, 2013 Repl. Vol.), § 12–302(c)(3) of the Courts and Judicial Proceedings Article. The Court of Special Appeals reversed the suppression court's "decision to suppress any testimony regarding any of the detectives' observations of the firearm subsequent to the stop," holding that "the stop of [Petitioner's] vehicle on July 13, 2011 was supported by articulable reasonable suspicion. . . ." *State v. Holt*, 206 Md.App. 539, 551, 51 A.3d 1 (2012). The Court of Special Appeals further concluded that, even if the investigatory stop was not supported by reasonable suspicion, "the exclusionary rule does not apply" because "any new crimes committed by [Petitioner] immediately following the stop, such as possessing, raising and pointing the firearm at Detective McShane and accelerating his vehicle towards Detective McShane, purged the taint from the unlawful stop." *Id.*

We granted a petition for a writ of certiorari to answer two questions, as posed by Petitioner:

1. Whether the Court of Special Appeals, in the face of well-established legal precedent to the contrary, erred in finding reasonable articulable suspicion to seize Petitioner based on the actions of another individual and purely associational facts?

2. Where the Court of Special Appeals acknowledges that this Court has not yet determined whether a new crime committed by a defendant after an illegal search or seizure is a sufficient intervening circumstance that can attenuate the taint of an illegal search or seizure, did the Court of Special Appeals err by concluding that any and all new crimes committed by a defendant purge[ ] the taint of the illegal actions of the police thereby rendering irrelevant the flagrancy of the police misconduct—the third factor of the balancing test set forth by this Court in *Cox v. State*, 421 Md. 630 [28 A.3d 687] (2011)?

Given our disposition of the case on the basis of the first question, we do not reach the second question.

## II.

■■■■ "In reviewing the ruling of the suppression court, we must rely solely upon the record developed at the suppression hearing." *Briscoe v. State*, 422 Md. 384, 396, 30 A.3d 870 (2011). "We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion," *id.*, here, Petitioner. "We defer to the [suppression] court's factual findings and uphold them unless they are shown to be clearly erroneous." *Lee v. State*, 418 Md. 136, 148, 12 A.3d 1238 (2011) (quoting *State v. Luckett*, 413 Md. 360, 375 n. 3, 993 A.2d 25 (2010)). The credibility of the witnesses and the weight to be given to the evidence fall within the province of the suppression court. *Gonzalez v. State*, 429 Md. 632, 647–48, 57 A.3d 484 (2012) (citing *Longshore v. State*, 399 Md. 486, 499, 924 A.2d 1129 (2007)). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Lee*, 418 Md. at

148–49, 12 A.3d 1238 (quoting *Luckett,* 413 Md. at 375 n. 3, 993 A.2d 25).

■■ Petitioner contends that we must defer to the suppression court's "first-level fact finding" that the detectives had no more than a "hunch" that Petitioner committed a crime. We have described "first-level findings" as those concerning "who did what to whom and when." *Longshore,* 399 Md. at 523, 924 A.2d 1129 (quoting *State v. Blackman,* 94 Md.App. 284, 293, 617 A.2d 619 (1992)). We defer to these findings because "the suppression hearing judge is at a vantage point to make [these findings] far more competently than we." *Id.* "Once credibility has been assessed and first-level findings of fact have been made, ... a very different issue emerges." *Id.* The evaluation of the reasonableness of the detectives' characterization of what they saw is a question of law for us to decide. *Crosby v. State,* 408 Md. 490, 510, 970 A.2d 894 (2009).

The finding that Petitioner contends is entitled to deference does not relate to the detectives' observations regarding "who did what." Rather, it relates to whether, based upon an objective assessment of the first-level observations of the detectives, those observations gave rise to a reasonable suspicion that Petitioner committed a crime. The suppression court ruled, based on *its* independent assessment of the facts known to the detectives, that the detectives had only a hunch that a drug transaction took place, and that a hunch "does not make reasonable suspicion." The suppression court, however, was in no better position than is this Court to make that legal assessment. We therefore owe the court's legal determination no deference; rather, we must perform our own appraisal of whether there existed reasonable suspicion to stop Petitioner. *See Lee,* 418 Md. at 148–49, 12 A.3d 1238.

### III.

■ The Fourth Amendment, which is applied to the states through the Fourteenth Amendment, protects against unreasonable searches and seizures. *See, e.g., Lewis v. State,* 398

Md. 349, 360–61, 920 A.2d 1080 (2007) (citations omitted). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

"[A] law enforcement officer may conduct a brief investigative 'stop' of an individual if the officer has a reasonable suspicion that criminal activity is afoot." *Crosby*, 408 Md. at 505, 970 A.2d 894 (quoting *Terry*, 392 U.S. at 30–31, 88 S.Ct. 1868); *see Cartnail v. State*, 359 Md. 272, 285, 753 A.2d 519 (2000) (quoting *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."). Accordingly, "a police officer who has reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion." *Crosby*, 408 Md. at 506, 970 A.2d 894 (quoting *Nathan v. State*, 370 Md. 648, 660, 805 A.2d 1086 (2002)). As with any warrantless search, however, "the State bears the burden to overcome the presumption of unreasonableness." *Briscoe*, 422 Md. at 396, 30 A.3d 870 (citing *Paulino v. State*, 399 Md. 341, 348, 924 A.2d 308 (2007)).

"There is no standardized test governing what constitutes reasonable suspicion." *Crosby*, 408 Md. at 507, 970 A.2d 894. "The concept of reasonable suspicion purposefully is fluid because ... [it] is not readily, or even usefully, reduced to a neat set of legal rules." *Cartnail*, 359 Md. at 286, 753 A.2d 519 (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)) (internal quotations omitted). The Supreme Court has described reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Illinois v.*

*Wardlow,* 528 U.S. 119, 128, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). We have described the standard as a "common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Crosby,* 408 Md. at 507, 970 A.2d 894 (quoting *Bost v. State,* 406 Md. 341, 356, 958 A.2d 356 (2008)). "While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an 'inchoate and unparticularized suspicion or hunch.' " *Id.* (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868) (internal quotations omitted); *see also Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ("Reasonable suspicion is a less demanding standard than probable cause . . . in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause. . . .").

We must examine the "totality of the circumstances" in each case to determine "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). "Thus, 'the court must . . . not parse out each individual circumstance for separate consideration.' " *Crosby,* 408 Md. at 507, 970 A.2d 894 (quoting *Ransome v. State,* 373 Md. 99, 104, 816 A.2d 901 (2003)). We have explained that the totality-of-the-circumstances test "contains two interdependent analytical techniques":

First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations . . . and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person. . . . The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individ-

ual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, . . ., said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Cartnail,* 359 Md. at 288, 753 A.2d 519 (quoting *Cortez,* 449 U.S. at 418, 101 S.Ct. 690).

 We therefore assess the evidence through the prism of an experienced law enforcement officer, and "give due deference to the training and experience of the . . . officer who engaged the stop at issue." *Crosby,* 408 Md. at 508, 970 A.2d 894 (citing *Ransome,* 373 Md. at 104–05, 816 A.2d 901); *Cartnail,* 359 Md. at 288, 753 A.2d 519 (quoting *Cortez,* 449 U.S. at 418, 101 S.Ct. 690) (noting that the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement"). We, of course, recognize that the deference we afford police officers is not without limits. We do not "rubber stamp conduct simply because [an] officer believed he had the right to engage in it" and "there must be an articulated logic to which this Court can defer." *Crosby,* 408 Md. at 509, 970 A.2d 894 (citations and internal quotations omitted); *see United States v. McCoy,* 513 F.3d 405, 415 (4th Cir.2008) ("a wealth of experience will [not] overcome a complete absence of articulable facts").

 Petitioner advances several arguments in support of his contention that the detectives here did not have reasonable suspicion to conduct an investigatory stop. He argues that: (1) no information directly related to *Petitioner* linked him to criminal activity; (2) the sole basis for the detectives' suspicion was Petitioner's brief association with Blue; and (3) to the extent the detectives relied on similarities between Blue's interactions with Townsend and Petitioner, "Mr. Blue's presence was the **only** true similarity between the two incidents."

The State disagrees, arguing that "considerably more than 'mere association' supported the vehicle stop." The State highlights the following facts: (1) Blue took a "cumbersome

detour" to Baltimore County before his meeting with Petitioner in Baltimore City; (2) the nature of Blue's meeting with Petitioner was similar to Blue's meeting with Townsend; (3) Blue behaved similarly during the meetings with Petitioner and Townsend; and (4) certain features of the meeting between Blue and Petitioner were "peculiar," such as the fact that the detectives did not observe the men use the exercise equipment next to which they met. The State contends that an experienced law enforcement officer, viewing these specific facts together, would reasonably suspect that Petitioner committed a drug-related crime. We agree with the State.

In conducting our independent analysis of whether the detectives had reasonable suspicion to stop Petitioner, we begin with the credibility determinations made by the suppression court. The suppression court stated that it was "very impressed by [the detectives'] candor." The court found that Detective Crystal was "honest and truthful and forthright," and except for his testimony that Petitioner committed traffic violations, Detective McShane was "very honest and truthful with the Court." These credibility determinations are virtually unassailable.

Petitioner seizes upon the suppression court's finding of "a lack of credibility regarding the testimony of the Detectives asserting they had probable cause to stop the Defendant due to a traffic violation." Petitioner is, of course, correct that the suppression court did not credit the detectives' testimony that they pulled over Petitioner because he committed a traffic violation, but that is the *only* testimony the court did not credit, and the State does not contend before this Court that a traffic violation provided a valid basis for the stop.[5] Consequently, we view the testimony of Detectives Crystal and McShane as an accurate recitation of Blue's meeting with

---

5. In its appeal to the Court of Special Appeals, "the State [did] not contest the [suppression court's] factual determination that a traffic violation did not take place." *State v. Holt*, 206 Md.App. 539, 546 n. 2, 51 A.3d 1 (2012). During oral argument before this Court, counsel for the State asserted that "the State has not pressed [before this Court] the [Circuit] Court's ruling that a traffic violation did not occur."

Townsend and what occurred before and during his meeting with Petitioner at Lake Montebello.

Based on that testimony, we are able to conclude the following: (1) Blue was a known drug dealer; (2) Blue distributed drugs to Townsend approximately two weeks before his meeting with Petitioner; (3) both Townsend and Petitioner were waiting for Blue at specific locations when he arrived at the meetings; (4) both meetings lasted approximately two minutes; (5) both Townsend and Petitioner parted ways with Blue after the meetings; (6) Blue looked around throughout both meetings; (7) Blue did not look around at the North Avenue Courthouse; (8) Petitioner and Blue moved from a public space to the private interior of Petitioner's Jeep; and (9) after his court appearance in Baltimore City, Blue drove to Baltimore County, where he exited an apartment carrying a sandwich-size Rubbermaid container, and then immediately returned to an area of Baltimore City not far from the courthouse he had visited earlier that morning, to meet Petitioner.

Petitioner correctly recognizes that we may consider as one factor in our analysis Blue's status as a known drug dealer. *See State v. Carroll,* 383 Md. 438, 461, 859 A.2d 1138 (2004) (criminal background of individual with whom defendant associated, among other factors, was relevant in determining whether officers had reasonable suspicion to warrant a "no-knock" entry); *United States v. Stepp,* 680 F.3d 651, 667 (6th Cir.2012) ("We have previously held that associating with a suspected drug dealer immediately prior to entering a vehicle substantially contributes to reasonable suspicion of a drug offense."). For its part, the State concedes, as it must, that an individual's association with a drug dealer does not, by itself, create reasonable suspicion that the individual committed a drug-related crime. Petitioner and the State, however, part ways over the question of whether Petitioner's association with Blue provided the sole basis for the detectives' suspicion that Petitioner committed a crime. That is the central question we must answer.

At the outset, we address the effect of the suppression court's factual finding that the detectives did not observe Petitioner commit traffic violations. That finding does not dispose of the question of whether the detectives had reasonable suspicion to conduct an investigatory stop; indeed, that inquiry is an entirely objective one, based on the first-level historical facts. See Devenpeck v. Alford, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); Whren, 517 U.S. at 813, 116 S.Ct. 1769 ("the constitutional reasonableness of traffic stops [does not depend] on the actual motivations of the individual officers involved"); see also Ransome, 373 Md. at 116, 816 A.2d 901 (Raker, J., concurring) ("The appropriate test is not what the investigating officer articulated, but whether, looking at the record as a whole, a reasonable officer in those circumstances would have reasonably believed petitioner was engaged in criminal activity."). We therefore look to the entire record to determine whether, viewed objectively, a law enforcement officer, knowing what the detectives in the present case knew, would harbor the requisite reasonable suspicion that Petitioner had committed a drug-related offense.

Here, the detectives testified about several factual parallels between the meeting at Lake Montebello and Blue's drug transaction with Townsend approximately two weeks earlier. With respect to Blue's behavior, the detectives testified that he looked around throughout his meeting with Petitioner the same way he had looked around throughout the drug transaction with Townsend. As for the nature of the meetings, the detectives testified that they lasted roughly the same amount of time (merely two minutes, or so), both started in public places, Townsend and Petitioner were waiting for Blue in what appears to be prearranged locations, and Townsend and Petitioner parted ways with Blue after those brief meetings. Accordingly, the specific characteristics of the meeting between Petitioner and Blue—and not merely Petitioner's "proximity to [a person] associated with drug activity" or his "brief

interaction with a known suspect"—supported the detectives' suspicion that Petitioner had committed a drug-related crime.

We necessarily defer to the training and experience of Detectives Crystal and McShane. *Crosby*, 408 Md. at 508, 970 A.2d 894 ("the court should give due deference to the training and experience of the law enforcement officer who engaged the stop at issue"). At the time of the suppression hearing, Detective Crystal had worked for the Baltimore City Police Department for over three years, participated in "numerous" long-term narcotics investigations, and received approximately 40 hours of specialized narcotics training. Detective McShane, on the other hand, had been a police officer for almost seven years, participated in "numerous" arrests involving controlled substances, and received approximately 168 hours of specialized narcotics training. Significantly, the detectives not only had general experience with drug transactions, but they also had experience observing Blue himself engage in a drug transaction.

Citing *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), Petitioner takes the position that "law enforcement cannot impute circumstances surrounding another person to the person who is the subject of the seizure." We agree with the principle that law enforcement officers cannot transfer their knowledge of an individual's criminal history to all those with whom that individual associates. *See State v. Nieves*, 383 Md. 573, 597–98, 861 A.2d 62 (2004) ("[T]he fact that the defendant was driving the truck of a [person] associated with drugs confuses the nature of the inquiry of whether there was reasonable, articulable suspicion that [the defendant] was carrying weapons or drugs."). It does not follow, however, and *Sibron* certainly does not require, that we ignore the characteristics of Blue's drug transaction with Townsend or disregard Blue's behavior before and during his meeting with Petitioner. Indeed, *Sibron* states only that "[t]he inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to sup-

port an intrusion by the police upon an individual's personal security." 392 U.S. at 62, 88 S.Ct. 1889. *Sibron* therefore stands for the narrow and undisputed proposition that a meeting with a known drug addict or dealer does not, by itself, create reasonable suspicion that a drug transaction occurred.

 The cases considering the relevance of the neighborhood in which a *Terry* stop occurred are instructive on this point. It is settled that "[t]he nature of the area is a factor in assessing reasonable suspicion." *Bost,* 406 Md. at 359–60, 958 A.2d 356; *see Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."). The general principle that emerges from these cases is that we may consider facts and circumstances not directly attributable to an individual in order to evaluate the reasonableness of an officer's suspicion that the individual may have committed a crime. Just as we may consider a defendant's presence in a "high-crime area" even though the defendant has no connection to previous crimes committed in that area, we may consider the characteristics of Blue's drug transaction with Townsend even though Petitioner was not involved in that transaction.

 The suppression court stated that "there were a bunch of innocuous facts, some have absolutely nothing to do with Mr. Holt" and "there are too many innocent, innocuous facts." We recognize that most, if not all, of the factual circumstances about which the detectives testified were not, on their face, incriminating. It is important to bear in mind, however, that context matters. *Crosby,* 408 Md. at 508, 970 A.2d 894. "[A]ctions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." *Id.* (quoting *United States v. Branch,* 537 F.3d 328, 336 (4th Cir.2008)). Put differently, "[a] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer." *Id.* (quoting *Ransome,* 373 Md. at

105, 816 A.2d 901); *see also Arvizu,* 534 U.S. at 277, 122 S.Ct. 744 ("A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct."). Accordingly, although the suppression court was correct that the series of acts the detectives observed were by themselves innocent, *taken together,* those acts supported the detectives' suspicion that criminal activity was afoot.

The suppression court was apparently "taken by what factual circumstances *did not* exist" at the time the detectives stopped Petitioner. *See McCoy,* 513 F.3d at 412. For instance, the suppression court stated that the detectives did not observe a hand-to-hand exchange, a phone call between Blue and Petitioner, or evidence that Petitioner was a member of Blue's criminal enterprise. To be sure, all doubt regarding the reasonableness of the detectives' suspicion that a drug transaction occurred would be resolved had the State offered such evidence. But our analysis focuses upon what factual circumstances *did* exist, not those that *did not.*

In the end, Detectives Crystal and McShane observed more than Petitioner merely associating with Blue. Rather, the detectives, who had recently studied a video of a drug transaction involving Blue, observed a meeting between Petitioner and Blue that mirrored in several respects that drug transaction. Moreover, the detectives testified about Blue's detour to Baltimore County before his meeting with Petitioner and articulated specific characteristics of that meeting that, when viewed through the lens of a trained law enforcement officer, support the detectives' suspicion that Petitioner committed a crime.

■ In analyzing the question before us, we bear in mind that reasonable suspicion "does not deal with hard certainties, but with probabilities," *Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581 (quoting *Cortez,* 449 U.S. at 418, 101 S.Ct. 690), and that "[r]easonable suspicion is a less demanding standard than probable cause," *White,* 496 U.S. at 330, 110 S.Ct. 2412. Against this important backdrop, we hold that the detectives possessed a reasonable and particularized basis to suspect that

Petitioner committed a drug-related offense. Because the detectives had reasonable suspicion to conduct an investigatory stop of Petitioner, he was not entitled to suppression of any of the detectives' observations during and immediately following the investigatory stop, including Detective Crystal's observation of a gun in Petitioner's hand. The Court of Special Appeals came to the same conclusion; we therefore affirm the judgment of that Court.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

HARRELL and GREENE, JJ., dissent.

GREENE, J., dissenting, in which HARRELL, J., joins.

Respectfully, I dissent. The detectives in this case, McShane and Crystal, only had an "unparticularized suspicion or hunch" when they stopped Petitioner Jamar Holt ("Petitioner" or "Mr. Holt"). *See Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968). Their "hunch" never reached the level of reasonable suspicion, and it is for this reason that I dissent from the Majority opinion. Accordingly, I would reach the second issue on appeal: whether the intermediate appellate court erred in holding that any new crime committed by a defendant after an illegal stop by the police purges the taint of the illegal police conduct, thus allowing the introduction of such evidence at trial.

First, considering the totality of the circumstances, the detectives did not obtain enough evidence to reach the reasonable suspicion threshold when they stopped Petitioner. "A traffic stop is justified under the Fourth Amendment where the police have a reasonable suspicion supported by articulable facts that criminal activity is afoot." *Lewis v. State,* 398 Md. 349, 361, 920 A.2d 1080, 1087 (2007). This Court has concluded "that the reasonable suspicion standard requires the police to possess 'a particularized and objective basis' for suspecting legal wrongdoing." *Lewis,* 398 Md. at 362, 920 A.2d at 1087 (quoting *Myers v. State,* 395 Md. 261, 281, 909 A.2d 1048, 1060 (2006)). In contrast, "mere hunches that unlawful activity is

afoot do not support a traffic stop." *Lewis*, 398 Md. at 364, 920 A.2d at 1088; *see, e.g., Cartnail v. State*, 359 Md. 272, 753 A.2d 519 (2000) (holding that the police officer did not have reasonable suspicion to pull over the Petitioner when he had not committed a traffic violation, and when the only evidence the officer had was a report from unidentified sources claiming they witnessed three black males rob a hotel and flee in a car similar to the car Petitioner was driving).

In the present case, not only was the evidence against Petitioner related solely to his association with Blue, but there was not a sufficient similarity between the June 29 meeting between Blue and Townsend and the July 13 meeting between Blue and Petitioner for officers to reasonably suspect Petitioner was involved in a drug transaction with Blue. Further, during the detectives' surveillance, no one witnessed an exchange of the tupperware or any other container or substance. There was also no direct evidence that the tupperware retrieved by Blue contained contraband or currency and Blue was not known to transport drugs in tupperware containers. What the Majority's opinion essentially will stand for is that if a person associates with a "known drug dealer," there is automatically reasonable suspicion to stop that person if found in the company of the "known drug dealer." Such an association and conclusion avoids all precepts of Fourth Amendment protection. Here, the trial court determined that "[t]here was no reasonable suspicion to justify an investigatory stop of Mr. Holt's vehicle.... [T]he purpose of that stop was [not] for anything more than to find out who the driver of the vehicle was, and see if they couldn't [sic] search the vehicle to find drugs," and moreover, the detectives' "instincts and hunches and the hairs on the back of their necks were raised, but that does not make reasonable suspicion." This was emphatically the correct conclusion and the findings of fact were not clearly erroneous.

Absent reasonable suspicion to justify the stop of Petitioner, the second issue on appeal becomes relevant; namely, whether any new crime committed by a defendant purges the taint of any illegal actions by the police thereby rendering irrelevant

the flagrancy of the police misconduct. I would hold that it was error to disregard the attenuation factors set forth in *Cox v. State*, 421 Md. 630, 28 A.3d 687 (2011), and its progeny when deciding whether a new crime committed after an illegal stop was enough to purge the taint of the illegal police misconduct.

Such evidence obtained following an illegal search or seizure is clearly the "fruit of the poisonous tree." Under that doctrine, direct or indirect evidence obtained in violation of the Fourth Amendment is excluded from a criminal trial. *Myers v. State*, 395 Md. 261, 291, 909 A.2d 1048, 1066 (2006). Not all evidence obtained subsequent to police misconduct is subject to the exclusionary rule, however. *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 445 (1963). Maryland courts are required to apply the factors outlined in *Cox* to determine whether evidence obtained is so attenuated as to purge the taint of the illegal conduct. The factors are: "(1) the proximity between the actual illegality and the evidence sought to be suppressed; (2) the presence of intervening factors; and (3) the flagrancy of the governmental misconduct involved in the case." *Cox*, 421 Md. at 652–53, 28 A.3d at 700. It would be reversible error to ignore this precedent when evaluating whether a new, distinct crime committed by the suspect is an intervening circumstance sufficient to purge the taint of the police misconduct in violation of the Fourth Amendment. *See Brown v. Illinois*, 422 U.S. 590, 601–04, 95 S.Ct. 2254, 2260–62, 45 L.Ed.2d 416, 425–27 (1975) (standing for the proposition that in order for the causal chain between an illegal arrest and subsequently obtained evidence to be broken, a consideration of the evidence's admissibility in light of distinct policies and interests of the Fourth Amendment is mandated).

The Court of Special Appeals's holding, that "a[ny] new [and distinct] crime, even if causally linked to illegal activity on behalf of law enforcement, is an intervening circumstance that attenuates the taint from that illegal activity," *State v. Holt*, 206 Md.App. 539, 565, 51 A.3d 1, 16 (2012), effectively eliminates the application of the above factors and completely

disregards the exclusionary rule as it pertains to new crimes committed following illegally obtained evidence. In particular, the intermediate appellate court's holding ignores the "flagrancy of governmental conduct" factor and establishes a new standard. As noted in *Cox*, "[t]his factor cuts to the heart of the purpose behind the exclusionary rule: to provide[ ] an incentive for police to engage in lawful conduct." 421 Md. at 655, 28 A.3d at 701–02 (quotations omitted). To ignore the third attenuation factor, then, would be to ignore the very purpose underlying the exclusionary rule, and would make the protections afforded to defendants by the Fourth Amendment obsolete.

Situations are certain to arise in which an assault on a police officer following an illegal stop is so attenuated to purge the taint of the officer's misconduct. For example, in a case where a suspect ran approximately two blocks from the officers following an illegal stop, and then pulled a gun and fired at them, it was held that this action was sufficiently attenuated as to avoid exclusion of such evidence under the Fourth Amendment. *United States v. Sprinkle*, 106 F.3d 613, 616, 620 (4th Cir.1997). In the present case, the suppression court was correct to apply the attenuation factors, in the first instance, to determine whether the Petitioner's subsequent illegal actions—namely, possessing a handgun and driving his vehicle in the direction of the officers—were sufficiently attenuated so as not to receive Fourth Amendment protection. The Court of Special Appeals, however, incorrectly chose not to apply those factors. The decision of whether a subsequent crime constitutes an intervening circumstance must be determined on a case-by-case basis, and ultimately, this analysis is whether Petitioner's actions were a new, distinct crime, which was "so attenuated from the evidence as to purge any taint resulting from said conduct," *Miles v. State*, 365 Md. 488, 520–21, 781 A.2d 787, 806 (2001). The intermediate appellate court did not partake in this analysis, and therefore, courts should not follow its reasoning in this regard.

Judge HARRELL authorizes me to state that he joins in this dissenting opinion.