*Mack v. State*, No. 1627, September Term 2017. Opinion by Wilner, J.

**CRIMINAL LAW – TERRY SEIZURE**

FACTS: Responding to an anonymous tip from a 911 caller that two African-American men were selling drugs from a silver Honda at a certain location, two police officers, in separate patrol cars observed a car with two passengers, one being appellant, matching that description at that location, with the car's motor running. The officers parked their cars in a way that precluded the Honda from being moved. A subsequent investigation, including observation of the two men and furtive conduct on their part, led to a frisking of the men, discovery of narcotics on one of them, a full search of the car, and discovery of a handgun. The trial court denied appellant's motion to suppress the gun.

HELD:
(1) The immobilization of the Honda prior to any encounter with the passengers constituted a seizure for purposes of *Terry v. Ohio*. The passengers were not free to leave the scene or terminate the ensuing encounter.
(2) At that point, the officers had no knowledge of criminality on appellant's part other than the anonymous tip. Confirmation that a silver Honda with two African-American men in it at the location was insufficient, under *Florida v. J.L.* and *Navarette v. California*, to constitute reasonable articulable suspicion that appellant was engaging, or had engaged, in criminal activity warranting such a seizure.
(3) Under Maryland law, 911 calls are recorded and, at least with respect to calls from land lines, the location and phone from which the call was made also is recorded, which can, but does not necessarily, give an enhanced reliability to the information.
(4) When the State is relying on an anonymous 911 call to provide probable cause or reasonable articulable suspicion, it should, when possible, produce the recording of the call, or explain the absence thereof, so that the court can have the ability to hear what actually was said in order to make a determination of the credibility of the information.

Circuit Court for Baltimore City
Case No. 117142015

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1627

September Term, 2017

_____

MAURICE MACK

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Fader,
Wilner, Alan M.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wilner, J.

_____

Filed: June 5, 2018

After trial on an agreed statement of facts, appellant was convicted in the Circuit Court for Baltimore City of unlawful possession of a regulated firearm, for which he was sentenced to imprisonment for five years without the possibility of parole. His sole complaint in this appeal is that the trial court erred in denying his motion to suppress the handgun – the regulated firearm – recovered by the police in the course of what he contends was an unlawful search of his vehicle. We find merit in his complaint and shall reverse the judgment.

The underlying facts, as presented at the hearing on appellant's motion to suppress, are largely undisputed. The evidence came from the testimony of two Baltimore City police officers – Charles Faulkner and Horace McGriff – and video recordings taken from the body cameras that Officer Faulkner and another City police officer, whom we know only as Officer White, were wearing.

Officers Faulkner and White responded to a report from the police dispatch unit that two African-American men, one wearing a blue jacket or coat and the other a gray jacket, were selling drugs from a silver Honda Accord in the 5500 block of Ready Avenue. Faulkner was aware that (1) that block of Ready Avenue, a narrow one-way street, was a "high drug, crime area" to which he had responded to calls numerous times, and (2) the dispatch report emanated from a 911 call that the dispatch unit said was anonymous – that the caller did not give his/her name or any identifying information. Faukner and White, in separate cars, arrived at the 5500 block simultaneously and saw a silver Honda, with two African-American men sitting in it. The Honda's motor was

running.  Knowing from experience that "usually when we have calls like that, most people will try to drive off" and that, in that area, "most people who are known for selling drugs do carry weapons," Faulkner parked his vehicle directly in front of the Honda and White parked his vehicle directly behind it, intending to block and effectively blocking the Honda from being moved.

Officer Faulkner, who initially was near the driver's side of the Honda, walked in front of the car to the passenger side.   As he did, he observed through the front windshield that (1) appellant was wearing a gray jacket, and (2) both men were dipping their shoulders down to the lower part of the seat.  From his ten years of training and experience as a police officer, Faulkner was aware that "an armed person would usually dip their hands down to the lower part of the seat, underneath the seat, to either grab a weapon or put one away." He felt that the men's actions were consistent with that and, as a result, he believed that they may be armed.  After speaking with the occupants and receiving appellant's driver's license, Faulkner ordered the passenger out of the car and began to frisk him for weapons.  Officer White removed appellant and began a frisk of him.

At that point, Sergeant McGriff arrived.  With 24 years of experience as a police officer, McGriff also was aware that the 5500 block of Ready Avenue was a "highly narcotic infested area."  He was aware as well that the call that brought him there was "a very specific call" regarding the individuals in the Honda and what they were doing.  Also of significance to him was that appellant was wearing a "puff coat" despite the fact that the outside temperature that day was above fifty degrees, that when it was that warm

2

police officers are allowed to wear short sleeve shirts, and that he was wearing one. Based on his training and experience, he testified that "[d]uring warm weather, usually puff coats are worn to secure detection of firearms, drugs, give an additional coverage in their personal lives."

As Officer White was frisking appellant, Sergeant McGriff noticed a small piece of plastic hanging outside appellant's underwear which, from McGriff's experience, he believed was part of "a sandwich bag which most likely had narcotics in it."[1]   He alerted Officer White and, as McGriff suspected, a ziplock bag of suspected drugs was found. Upon that discovery, another officer who had arrived on the scene searched the car and found the handgun that appellant sought to suppress.

As he does here, appellant contended that the mere blocking of his car by Officers Faulkner and White constituted an unlawful seizure under *Terry v. Ohio*, 392 U.S. 1 (1986).  The unlawfulness, he argued, arose from the fact that the only basis for the stop was the anonymous tip that was relayed through the police dispatch unit and that the U.S. Supreme Court had declared in *Florida v. J.L.,* 529 U.S. 266 (2000), and this Court and the Court of Appeals had confirmed in subsequent cases, that an anonymous tip, without more, is insufficient to justify even a *Terry* seizure, much less a *Terry* frisk or a full-

---

[1] Sergeant McGriff explained that "people who are distributing narcotics have a tendency to conceal it in what we call break bags, plastic sandwich bags of which they hold the narcotics inside.  If they are approached by police officers, there are little areas they put it in, underwear, pockets, of course, under the armpit of the jacket and – whatever they can access quickly."

3

blown search.  The hearing judge found those cases distinguishable and, in part for that reason, denied the motion to suppress.

DISCUSSION

As noted, there is no genuine dispute as to the facts as stated above. The only issue before us is one of law, which we resolve *de novo*.  The issue raised is in two parts – whether the effective immobilization of appellant's car, from which all else flowed, constituted an unlawful seizure mandating suppression of the gun, and if not, whether the tip, coupled with what the officers learned after they reached the Honda and its two occupants, sufficed to allow the car to be searched.  Because we find that the immobilization of the car constituted an unlawful seizure of appellant, we need not address the second part of the issue.

Encounters between the police and members of the public whom they may suspect of criminal wrongdoing run a gamut with innumerable variations, but, as explained in *Pyon v. State*, 222 Md. App. 412 (2015), they have generally been placed into three categories for Fourth Amendment purposes.  First, there is the arrest, which is the most significant form of seizure of the person and requires, for its validity, probable cause to believe that the person is committing or has committed an offense for which an arrest is permissible.

The intermediate category is the *Terry* stop, sometimes referred to as an investigatory stop.  As Judge Moylan pointed out in *Pyon,* it constitutes "a Fourth Amendment intrusion upon a citizen's otherwise unfettered freedom," but it is of lesser

4

duration than an arrest and for a different purpose. It does not require probable cause but only a "reasonable, articulable suspicion of criminal activity" and "may only last as long as it takes a police officer to confirm or dispel his [or her] suspicions." *Pyon*, 222 Md. App. at 420.

The most innocuous category is an "accosting," sometimes referred to as a "consensual encounter." It involves situations "where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away." *Id.* at 421. Fourth Amendment guarantees are not implicated in such an encounter, said the *Pyon* Court, "unless the police officer has by either physical force or show of authority restrained the person's liberty *so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." Id*. at 421-22 (quoting from *Swift v. State*, 393 Md. 139, 151 (2006), but emphasis in *Pyon*).

Though acknowledging that appellant's vehicle "could not move because it was blocked," the trial court regarded that immobilization as simply initiating what it referred to as "a field investigation based on the anonymous tip" and focused on what the police observed when approaching the Honda on foot and engaging with the passengers. It did not pay sufficient attention, however, to the consequence of the immobilization itself, which was the threshold issue before it and that is now before us – the undisputed fact that, due to the blocking of his car, appellant was not free to leave and terminate the encounter.

5

On the undisputed facts presented at the suppression hearing, the immobilization of the Honda fell squarely within the circumference of a *Terry* stop – a temporary seizure that required reasonable articulable suspicion of possible criminal activity.[2] The immediate issue is whether the record suffices to establish that level of suspicion, and the resolution of that issue hangs on the weight that may be given to the information relayed in the 911 call, to the extent confirmed by the officers' observations at the moment they immobilized appellant's car. That, in turn, is guided principally by two Supreme Court cases – *Florida v. J.L., supra*, and *Navarette v. California*, 134 S. Ct. 1683 (2014).

In *Florida v. J.L.*, an anonymous caller reported to the Miami-Dade police department that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. No audio recording of the call was placed in evidence, and the record revealed no information regarding the informant. At some point, two officers arrived at the scene, observed three black males "just hanging out," one of whom, J.L., was wearing a plaid shirt. Apart from the anonymous call, the officers had no reason to suspect any of the three of illegal conduct. One of the officers approached J.L., frisked him, and recovered a gun from his pocket. J.L. was charged with unlawfully carrying a concealed weapon and moved to suppress the gun as the fruit of an unlawful search. The

---

[2] As determined by the *Pyon* Court, "[a]s long as the passenger is presently being restrained by force or show of authority, we see no doctrinal significance in whether he had theretofore been moving or not." *Pyon v. State, supra*, 222 Md. App. at 436. In other words, there is no meaningful difference, for purposes of *Terry*, between physically stopping a vehicle that is in motion and immobilizing a vehicle that already is parked.

6

Florida Supreme Court agreed with the trial court that the search was invalid, and the Supreme Court affirmed that decision.

The Supreme Court began its discussion by observing that the officers' suspicion that J.L. was carrying a gun arose "solely from a call from an unknown location by an unknown caller" and not from any observations of their own. It noted then that "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her [or his] allegations turn out to be fabricated . . . 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" *Id*. at 270, quoting in part from *Alabama v. White*, 496 U.S. 325, 329 (1990).

The *J.L.* Court acknowledged that there are situations "in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop,'" citing as an example *Alabama v. White*, where an anonymous caller reported that a woman was carrying cocaine and would be leaving an apartment building at a specified time, would get into a car matching a particular description, and would drive to a named motel. Standing alone, the *White* Court said, that tip would not have justified a *Terry* stop, but after police observation confirmed what the caller had said would occur – *i.e.*, the "predictive" information – the Court held that the suspicion became reasonable.

The *J.L.* Court contrasted that situation from the one before it, where there was no predictive information that the police could confirm. The Court accepted that an accurate description of a subject's observable location and appearance may be taken as reliable, but the fact that the allegation about the gun turned out to be correct "does not suggest

7

that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct." *Florida v. J.L. supra,* at 271. The critical point was that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* The Court added, as really the crux of its decision on this issue, that:

> "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."

*Id.* at 272.

Justice Ginsburg's Opinion for the Court in *J.L.* was unanimous, but Justice Kennedy, joined by Chief Justice Rehnquist, filed a Concurring Opinion that became a clear segue into *Navarette* fourteen years later. Those Justices agreed that the tip in the *J.L.* case did not justify the officer's immediate stop and frisk of the defendant because the record failed to indicate any documentation of whether the call was made either by a voice recording or tracing the call to a telephone number. They observed that a tip "might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action." *J.L.* at 275.

One such feature, they noted, may be that the tip predicts future conduct of the alleged criminal," which was the case in *White*, but "[t]here may be others." *Id.*

Presciently, they offered as an example, "[i]f an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip." *Id.* at 276. In that regard, they acknowledged:

> "Instant caller identification is widely available to police, and, if anonymous tips are proving unreliable and distracting to police, squad cars can be sent within seconds to the location of the telephone used by the informant. Voice recording of telephone tips might, in appropriate cases, be used by police to locate the caller . . . . and the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips."

Appellant seeks to apply the holding in *J.L.*, but not the leeway offered in the Concurring Opinion, in this case. He posits that Officers Faulkner and White had no right to rely on the anonymous tip – which is all they had – in deciding to immobilize his car. We shall end up agreeing with him, but only after considering *Navarette*.

In *Navarette*, the Mendocino County 911 dispatch team for the California Highway Patrol (CHP) received a call from a CHP dispatcher in a neighboring county, who relayed a tip from a 911 caller that a silver Ford pickup truck, with license number 8D94925, had run the caller off the road and was last seen about five minutes earlier southbound on Highway 1 at mile marker 88. The Mendocino dispatcher broadcast that information to its CHP officers.

About eighteen minutes after the call, a CHP officer observed the truck on Highway 1 near mile marker 69 – nineteen miles south of the location reported by the caller – and stopped it. A second officer also responded. As the two officers approached the vehicle, they smelled marijuana, whereupon they searched the truck, discovered 30

9

pounds of the substance, and arrested the driver, Navarette, and a passenger. The defendants moved to suppress the evidence on the ground that the officers lacked reasonable suspicion of criminal activity to justify the stop. The motion was denied, and the resulting conviction was affirmed by a California Court of Appeals and ultimately by the U.S. Supreme Court.

The Supreme Court began by confirming the principles that the Fourth Amendment permits brief investigative stops "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,'" that the reasonable suspicion necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability," and that those principles apply "with full force to investigative stops based on information from anonymous tips." *Id*. at 1687-88. The Court confirmed that an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity but that, under appropriate circumstances, "an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Id.* at 1688.

After discussing both the *White* and *J.L.* cases, the *Navarette* Court concluded that "[e]ven assuming for present purposes that the 911 call was anonymous . . . the call bore adequate indicia of reliability for the officer to credit the caller's account" and "the officer was therefore justified in proceeding from the premise that the truck had, in fact, caused the caller's car to be dangerously diverted from the highway." 134 S. Ct. at 1688-89. In reaching that conclusion, the Court noted (1) that, in contrast to *J.L.,* where the tip

10

provided no basis for concluding that the tipster had actually seen the gun, the caller in *Navarette* necessarily claimed eyewitness knowledge of the alleged dangerous driving," (2) the officer's observation of the truck at a location where it logically might be based on a timeline of events gave reason to believe that the 911 caller was telling the truth, and (3) "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity."[3]  *Id.* 1689.

Important in the context of this case, the Court treated the caller's use of 911 to report the incident as "[a]nother indicator of veracity."  *Id.* at 1689.  Picking up on the views expressed in the *J.L.* Concurring Opinion, the *Navarette* Court pointed out that, under California law, "911 calls can be recorded, which provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution," and that they permit law enforcement to verify important information about the caller," including the caller's phone number and geographic location.  *Id.* at 1690.

None of that, the Court cautioned, is to suggest that 911 calls are *per se* reliable.  It determined, however, that "a reasonable officer could conclude that a false tipster would think twice before using such a system" and that "[t]he caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on information reported in the 911 call."  *Id.*  Pointing out that even a reliable tip will justify an investigative stop "only if it creates a reasonable suspicion that criminal

---

[3] Cited for that statement was Justice Kennedy's Concurring Opinion in *J.L.*  In that Concurring Opinion, Justice Kennedy used the word "impunity" rather than "immunity."

11

activity may be afoot," the Court then considered whether the call in question created that suspicion and concluded that it did. *Id.*

There have been at least two dozen cases in the Federal and State courts discussing and applying a *Navarette* analysis when a *Terry*-type stop was triggered by information that originated with a 911 call. In those cases, the courts have considered all of the pertinent information available to the officers and reached different conclusions based on the particular facts.[4] That is the proper approach. When reviewing whether reasonable suspicion exists, the test is the totality of the circumstances viewed through the eyes of a reasonable and prudent police officer. *Sellman v. State*, 449 Md. 526, 542 (2016). It is important to recall that, in *Navarette*, the Supreme Court did not rely solely on the fact that the tip was through a 911 call but also that the caller's report indicated personal knowledge of the alleged violation of law.

The problem in this case, for the State, is, in part, the problem that led to the result in *J.L.* – the absence of a record that can support an enhanced reliability of the 911 call, which is less excusable here than it may have been eighteen years ago in *J.L.* It is the State's burden to prove that a search or seizure was reasonable. *Holt v. State*, 435 Md. 443, 459 (2013); *Bailey v. State*, 412 Md. 349, 366 (2010). When the State is forced to

---

[4] Compare, for example, *United States v. Edwards*, 761 F.3d 977 (9th Cir. 2014), *United States v. Williams*, 837 F.3d 1016 (9th Cir. 2016), *United States v. Mosley*, 878 F.3d 246 (8th Cir. 2017), *State v. Gamble,* 95 A.3d 188 (N.J. 2014), *United States v. Browne*, 233 F. Supp. 3d 814 (C.D. Cal. 2017) and *People v. Argyris,* 27 N.E.3d 425 (N.Y. 2014), upholding a stop and subsequent search based, at least in part, on *Navarette,* with *State v. Z.U.E.*, 352 P.3d 796 (Wash. 2015) and *United States v. Pollins*, 145 F. Supp. 3d 525 (D. Md. 2015), holding the stop and search to be unlawful.

rely solely or predominately on an anonymous tip, it must provide persuasive evidence that the tip was reliable. No such evidence was forthcoming in this case.

We can take judicial notice of Md. Code, §§ 1-301(h) and 1-304 of the Public Safety Article (PS), which are part of the subtitle dealing with the 911 emergency telephone system, and of implementing regulations promulgated by the Department of Public Safety and Correctional Services. PS § 1-304 requires that each county (which includes Baltimore City) have in operation an "enhanced 9-1-1 system." PS § 1-301(h) defines that term as a system that provides "automatic number identification" and "automatic location identification." COMAR § 12.11.03.06 requires at a minimum, that an enhanced 911 system implemented in Maryland include, among other things:

E. Electronic recording of all 9-1-1 calls;

F. Playback capability of all 9-1-1 calls;

L. Automatic location identification (ALI), which displays, at the public safety answering point, the address or location of the calling instrument; and

M. Automatic number identification (ANI), which displays, at the public safety answering point, the calling telephone number.

Apart from these automatic tracing devices,[5] standard operating procedure for 911 calls includes asking the caller's name, location, and telephone number, which the caller may decline to give. The answers given to these questions and others that may elicit the

_____

[5] It is not clear, and we do not speculate, whether automatic tracing is possible or effective in some instances, with the advent of throwaway (burner) cell phones that can be purchased for less than $10, or calls from VOIP (Voice Over Internet Protocol) devices.

13

extent of the caller's knowledge regarding what he or she is reporting, coupled with whatever information is recorded automatically, can provide a much better basis for determining the caller's knowledge and reliability than broad assumptions or inferences drawn merely from whether the call is an anonymous one. Given the real and ever-present public concern about retaliation, legitimate callers with accurate information of criminal activity and with no improper motive may have good reason to refrain from offering recordable identifying information.

In light of *J.L.* and its progeny, it would behoove the State, when relying on an anonymous 911 tip, to produce the recording (or explain its absence) and give the suppression court the ability to listen to the conversation – *all* the information supplied by the caller and not just what the police dispatcher relayed to the patrol officers – in order to make a more informed judgment regarding its reliability. That was not done here. The suppression judge had nothing but a double-level hearsay statement of what the officers heard from the police dispatcher, which may have been merely an incomplete summary of what the anonymous caller actually told 911. As in *J.L.*, the subjects of the call were found where the caller said they were, but what was lacking was any way of concluding that the caller knew they were or would be selling drugs at that location, and there was no corroboration of that prior to immobilizing the car. The seizure therefore was not based on a reasonable articulable suspicion of criminal activity on the part of appellant.

**JUDGMENT REVERSED;
MAYOR AND CITY COUNCIL OF
BALTIMORE TO PAY THE COSTS.**

14