*Montay D. Shuler v. State of Maryland*, No. 2257, September Term, 2023. Opinion by Eyler, Deborah S., J. Filed October 31, 2025.

**PROBABLE CAUSE TO SUPPORT WARRANTLESS ARREST – ANONYMOUS 911 CALL – RELIABILITY OF CALLER'S INFORMATION – EVIDENCE CONSTITUTING REASONABLE BELIEF THAT THE SUSPECT COMMITTED THE CRIME – LACK OF EVIDENCE GENERATED AT TRIAL TO SHOW INVOLUNTARINESS OF DEFENDANT'S STATEMENT.**

On a summer evening in West Baltimore, shots were heard outside and calls started to come into 911. One caller reported, anonymously, that she heard the shots and saw two men run to a white car and drive off. She described the men and specified their location; gave the operator the vehicle's license plate number; explained the route the men left by; and said that when she got closer to the area where the white car had been, she saw a body in a parked car. Responding officers found the bodies of two victims in the car, both shot to death. The police determined that the appellant was the registered owner of the vehicle, a white Subaru. They prepared an "attempt to locate" flyer setting out information about the vehicle. About twenty-four hours after the shootings, the police located the vehicle on a grocery store parking lot near where the shootings had taken place. They tracked the appellant as he left the store and was approaching the vehicle and asked him his name, which he gave. They placed him under arrest and took him to the station house. A key fob on his person was linked to the vehicle. Immediately after the arrest, police saw from outside the vehicle part of a gun under the driver's seat. They obtained a search warrant for the vehicle and recovered the gun, which was determined to have belonged to one of the victims. At the station house, detectives interviewed the appellant for about fifteen minutes. He gave a statement denying having anything to do with the shootings and claiming to be miles away when it happened. The appellant testified at trial, admitting that he had shot the victims. He claimed he had driven to the area so a friend who was with him could purchase drugs from one of the victims, and when the drug deal went wrong, he shot the victims in self-defense and in defense of his friend.

The suppression court denied the appellant's motion to suppress all the evidence he claimed flowed from his arrest for lack of probable cause to arrest. The trial court declined to give a jury instruction on voluntariness of the appellant's statement to the police. The appellant was convicted of two counts of voluntary manslaughter, one count of robbery with a deadly weapon, and related crimes.

*Held*: Judgments affirmed. The suppression court's factual findings were supported by the evidence and the inferences it drew from those facts, that the two men running to the white car probably were the shooters making their getaway and that the man driving the car probably was its owner, were reasonable. The caller's report to 911 was a reliable source of information even though it was given anonymously. As an auditory witness to the shootings and a visual witness to the getaway, she gave a firsthand contemporary

account of the events. Her information was detailed and particularized, and she was calling the police to aid law enforcement. In addition, although the caller did not give her name, the 911 system operates so as to allow identification of any caller, if sought.

The evidence known to the police when the arrest was carried out was sufficient to constitute probable cause. The standard is whether, under the totality of the circumstances, the arresting officer had a reasonable belief that the appellant had committed the crimes in question, i.e., those flowing from the shootings of the two victims twenty-four hours earlier. The total circumstances included a specific identifier – the license plate number – of the likely getaway vehicle; identification of the appellant as the owner of that vehicle; the appellant's being found near the vehicle's location in a parking lot as he was approaching it; the appellant's identification of himself as the owner of the vehicle; and that no one else was with him at that time. A license plate number of a vehicle involved in a crime is very strong identifying evidence. From this information, the arresting officer reasonably could believe that the appellant's vehicle had not been stolen prior to the shootings; that he had driven his vehicle to the location of the shootings; that he was one of two men who committed the shootings; that he ran to his vehicle afterward; and that he drove his vehicle away from the location of the shootings. The passage of twenty-four hours from the time of the shootings did not dissipate probable cause to arrest the appellant.

The trial court did not err in declining to give a voluntariness instruction because the evidence adduced at trial did not generate the issue of the voluntariness of the appellant's statement to the police. The statement was used at trial for impeachment only, not for its substance, and the jury was given a limiting instruction to that effect. The statement was not a confession and indeed was exculpatory. It was given during a brief interview that took place after *Miranda* warnings were given and ended when the appellant asked for counsel. There were no facts adduced about the circumstances of the interview that would support a reasonable finding that the appellant's will was overborne or that the statement was the product of threats, coercion, or improper promises, or that there were any circumstances that could make it inadmissible as involuntary. And during the trial, the defense had acknowledged that it was, in fact, a voluntary statement.

Circuit Court for Baltimore City
Case No.: 121306006

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2257

September Term, 2023

_____

MONTAY D. SHULER

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Kehoe, S.,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: October 31, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

A jury in the Circuit Court for Baltimore City convicted Montay D. Shuler, the appellant, of two counts of voluntary manslaughter in the shooting deaths of Brian Palmer and Darrin Stewart. He also was convicted of one count of robbery with a deadly weapon, two counts of use of a firearm in the commission of a crime of violence, and illegal possession of a regulated firearm.[1] The court imposed a total sentence of seventy years' incarceration with the first ten years to be served without the possibility of parole.

In this timely appeal, the appellant poses two questions for review, which we have reworded:

I.      Did the suppression court err by ruling that the appellant's arrest was supported by probable cause?

II.     Did the trial court abuse its discretion by declining to give the appellant's requested jury instruction on voluntariness?

For the reasons to follow, we answer both questions in the negative and shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On the evening of August 5, 2021, several calls came into 911 reporting shots fired in a residential neighborhood in West Baltimore, near Edmondson Village Shopping Center. The police responded to the 4300 block of Flowerton Road, where they found the dead bodies of Brian Palmer and Darrin Stewart inside a red Ford Focus car. Each man had sustained two gunshot wounds to the head and one to the lower abdomen.

---

[1] The appellant was acquitted of first-degree premeditated murder, first-degree felony murder, second-degree murder, and conspiracy to commit robbery with a dangerous weapon.

Crime scene technicians recovered bullets, bullet fragments, 9 mm cartridge casings, suspected controlled dangerous substances, and Palmer's cell phone, among other things. A digital forensic download of Palmer's cell phone showed that, on the day of the shooting, a man named Raekwon Griffin texted him, wanting to buy a pound of marijuana and suggesting they meet outside 4313 Flowerton Road. Griffin asked whether Palmer would allow him to pay later, but Palmer refused. Griffin then texted, "My brother going to be with me, we going half, if it's cool with you." In his last text message, Palmer responded, "That's fine, red Focus pulling up."

The police received information that led them to arrest the appellant for the homicides the next evening, including that he was the registered owner of a white Subaru matching the description and license plate number given by an anonymous 911 caller moments after the shootings. After the arrest, the police obtained a warrant to search the Subaru. Under the driver's seat they found "a Ruger 57 semi-automatic handgun" ("the Ruger"), a firearm that belonged to one of the victims.[2] Given the 9 mm size of the casings found at the crime scene, the Ruger was ruled out as the weapon used in the shootings. The appellant's and Griffin's fingerprints were found in the Subaru.

Upon arresting the appellant, police obtained his cell phone from his person. The police transported him to the station house where, after receiving *Miranda* advisements,[3]

---

[2] The correct number for the weapon is the Ruger 5.7, which stands for 5.7 x 28 mm caliber.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

he was interrogated and gave a statement, which was videotaped, in which he denied being involved in the shootings or being in the vicinity of the shootings when they occurred.

Historical cell site analysis for the appellant's and Griffin's cell phone numbers placed both of them near the scene of the shootings. The appellant's cell phone showed two incoming calls from an inmate at the Baltimore City Detention Center. He received the first call fifteen minutes after the shootings. In the recording of the call, the appellant is heard telling the inmate he "just caught an and one," which means a double murder, and they "came up on a P," which means a "pound," referring to "the drug deal that was supposed to happen." The appellant referred to "a 57" that "starts with an R," meaning the Ruger that police would recover the next day from his Subaru. The inmate told the appellant to "hold on to the gun for him" and discussed a $3,000 price for it. The appellant received the second call, from the same inmate, the day after the shootings but before he was arrested. In the recording of that call, the appellant said he was "holding onto [the Ruger] and also that he got rid of the 9 right away."

On the first day of trial, the court held an evidentiary hearing on a suppression motion the appellant had filed in which he argued that neither his arrest nor the warrant to search the Subaru was supported by probable cause. The court denied the motion.[4] The trial went forward but resulted in a mistrial after the jury hung.

---

[4] In this appeal, although the appellant does not argue that the court erred in denying the motion to suppress as to the search warrant for his car, he maintains that anything found in the search of the car was the fruit of the unlawful arrest.

In his second trial, the appellant raised self-defense and defense of others, and testified on his own behalf.[5] As the appellant told it, after work on August 5, 2021, he encountered Griffin, a friend, who wanted to "buy some weed." They drove the appellant's white Subaru to the street in front of Griffin's old residence on Flowerton Road and waited. When a red Ford Focus arrived, Griffin got out of the car and walked over to it. Griffin and the driver of the red Ford Focus began to fight over money. The driver reached for a gun, and then the driver and Griffin "were fighting over one gun and the money at the same time." At that point, the appellant got out of his car and noticed the passenger in the Focus reaching under his seat. The appellant pulled out his "ghost gun" and shot the passenger. Griffin was still struggling with the driver, so the appellant shot the driver too. His weapon malfunctioned, discharging more than two bullets. The appellant took the driver's gun from Griffin to "get rid of it." He sold his own "dirty" gun, but kept "the clean one."

We shall add material from the record in our discussion of the issues.

## DISCUSSION

### I.

### Probable Cause

The appellant contends the police lacked probable cause to arrest him and, therefore, the evidence he maintains flowed from his arrest – the Ruger, fingerprints from the Subaru, his recorded statement, his cell phone, and the incriminating evidence generated from his

---

[5] The appellant did not testify at the first trial.

cell phone, including his telephone calls with the inmate in the detention center – should have been suppressed. The State counters that the arrest was supported by probable cause.

**(i)**

At the suppression hearing, it was undisputed that the fatal shootings of Palmer and Stewart happened on the evening of August 5, 2021. Immediately, beginning at 8:17 p.m., calls reporting shots fired started coming into 911. The State introduced into evidence the recording of an anonymous 911 call, received from a woman at 8:20 p.m.; an "attempt to locate" flyer prepared by the police based on their investigation of the information from that 911 call; and the body-worn camera footage from Detective Brian Ralph, who arrested the appellant on August 6, 2021, almost exactly twenty-four hours after the shootings. The appellant did not testify or introduce any evidence at the suppression hearing.

The judge listened to the anonymous 911 call. Sirens can be heard in the background. The call goes as follows:

> CALLER: There was a shooting at the – at the alleyway of the 900 block of Wicklow Road. I'm not sure of the cross street. It's not Wicklow, it's the street above that. Flowerton, I think it is.
>
> OPERATOR: Stay with me. What's the correct location? We're saying Flowerton, the 900 block?
>
> CALLER: I think it was Flowerton and the 900 block of Wicklow Road. I – I heard – **I heard some shooting** –
>
> OPERATOR: Uh-huh.
>
> CALLER: – **and then I saw two guys go run to a car**.
>
> OPERATOR: Any description for the vehicle?
>
> CALLER: White vehicle, and I have the tag number.

OPERATOR: Okay. What is it?

CALLER: **And it went down the alleyway**, the Wicklow – Wicklow alleyway. And they made a left down at the corner – not at Wicklow but the next street – not at Colburne but the next street down.

OPERATOR: Left at Woodbridge?

CALLER: Yeah, I think it was. Give me one second. This is an anonymous call.

OPERATOR: Okay.

CALLER: **But I drove up there to see what happened, and this guy was shot in his car.**

OPERATOR: Okay.

CALLER: The tag number is 3ER3069.

OPERATOR: That was Maryland?

CALLER: Uh-huh. **A white vehicle, two males**.

OPERATOR: Okay. Black males?

CALLER: Yes.

OPERATOR: Any clothing description for either?

CALLER: I – **they were running to the car**. And I was down the street, but I think they had on white, if I'm not mistaken –

OPERATOR: Okay.

CALLER:– like a beige color.

OPERATOR: Okay.

CALLER: Somewhat the color of the car, I think.

OPERATOR: White or beige shirt?

CALLER: I think so. I –

OPERATOR: On each one of them?

CALLER: No. I just know I got the tag number and the car, but I think –

OPERATOR: I thank you –

CALLER: [inaudible two seconds elapsed time]

OPERATOR: I thank you.

CALLER: I ran and got in my car.

OPERATOR: Yeah, absolutely. I thank you so much. I'm putting it – the information in for the respondents now.

CALLER: All right. So they headed down – down – not further up.

OPERATOR: You said down the alley from Wicklow towards Woodbridge and then left on Woodbridge?

CALLER: Right. Right.

OPERATOR: That's what I have. I'm putting it in just that way.

(Emphasis added.)

In summary, the caller heard shots fired around the intersection of Flowerton Road and an alley behind the 900 block of Wicklow Road and saw two African American men run to a white car, which then drove down that alley and turned left on Woodridge Road. From the caller's description, she appeared to be familiar with the neighborhood. She did not give her exact location, but was close enough to the white car to read its license plate, which she gave to the 911 operator. She thought the men were wearing light colored clothes

that were around the same color as the car. She drove her own car closer to where the shots were fired and saw a man inside a car who had been shot.

The police determined that the vehicle with Maryland tag number 3ER3069 was a white Subaru Legacy registered to the appellant. They prepared and distributed the "attempt to locate" flyer, which advised that the police were "attempting to locate the . . . listed vehicle" "[i]n reference to a Homicide by shooting that occurred in the 4200 Block of Flowerton Rd" on "08/05/2021[.]" The flyer asked "[a]ny [u]nit coming in contact with this vehicle [to] approach with caution, hold any and all occupants and notify" a certain identified homicide detective. The flyer featured two photos of the vehicle, seemingly taken by a surveillance camera, showing the distinctive white sedan from an elevated rear position, bearing the license plate identified by the 911 caller, and having a sunroof and a rear "spoiler." The flyer gave the make, model, color, and year of the vehicle, and its Maryland tag number and Vehicle Identification Number.

The videotape from Detective Ralph's body-worn camera showed the appellant being arrested in the parking lot of the Giant Food at Edmondson Village Shopping Center, which is two to three blocks from where the shootings occurred, toward where the 911 caller described the white car driving after the shootings. A police helicopter had spotted the Subaru driving to the Giant and parking in the lot. Police watched the appellant park the car, enter the store, and exit the store. He was walking from the store, nearing the front of the white Subaru bearing the license plate number the 911 caller had reported, when Detective Ralph approached and asked his name, which he gave. While other officers were applying handcuffs, Detective Ralph frisked the appellant and found a key fob in his

8

pocket. Detective Ralph pressed the key fob, which connected audibly to the Subaru. The appellant was put in leg restraints and was told he was going to be taken to the station house. After that, officers on the scene looked through the windows of the Subaru and, without opening a car door or entering the vehicle, saw part of a gun protruding from under the driver's seat. As noted, the police obtained a search warrant for the Subaru and recovered the Ruger.

Defense counsel argued that the information in the anonymous 911 call was the sole basis for the arrest and at most gave the police reasonable suspicion to stop the appellant and his vehicle, not probable cause to arrest him.[6] He made the factual argument that the two men the 911 caller saw just as well could have been people in the neighborhood running away from a shooting for their own safety. The suppression judge disagreed:

> [T]he police had the benefit of a 911 call. That 911 call stated with a great amount of detail that – and I appreciate your advocacy on behalf of the vehicle not necessarily being involved in the shooting, **but my take on that 911 call was that caller was saying that the shooter – shooters got into that car.**
>
> I believe that **those comments, and they certainly appear to me, at least, to be reliable. Those would . . . amount to probable cause for the police to search the registered owner of that vehicle.**
>
> \* \* \*
>
> I am going to deny the defense motion to suppress both Mr. Shuler's arrest as well as any search of him . . . **I think they had probable cause . . . because he's the registered owner of the vehicle, he's in possession of that vehicle about 24 hours after it is seen leaving the scene of a double murder.**

---

[6] The State does not contest that the appellant was placed under arrest when the handcuffs were applied to him.

9

> *I, frankly, reasonable minds can differ, and I think we do, but based on what I've heard, I believe the police had probable cause to arrest Mr. Shuler[.]*

(Emphasis added.)

**(ii)**

On review of a ruling on a suppression motion, "[w]e consider only the record from the suppression hearing, which we assess in the light most favorable to the prevailing party, and we accept the [hearing] court's factual findings absent clear error." *State v. McDonnell*, 484 Md. 56, 78 (2023). *See also Grant v. State*, 449 Md. 1, 14-15 (2016). We give due weight to inferences the hearing judge drew from her non-clearly erroneous factual findings. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). "The validity of a suppression ruling is a mixed question of law and fact." *Richardson v. State*, 481 Md. 423, 444 (2022). "'The ultimate determination of whether there was a constitutional violation . . . is an independent determination that is made by the appellate court alone, applying the law to the facts found in each particular case.'" *State v. Carter*, 472 Md. 36, 55 (2021) (quoting *Belote v. State*, 411 Md. 104, 120 (2009)).

The Fourth Amendment to the federal constitution, applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. Its "ultimate touchstone . . . is 'reasonableness.'" *Richardson*, 481 Md. at 445 (quotation marks and citations omitted). When evaluating the reasonableness of the government intrusion against the personal security of the individual, we conduct "a totality of the circumstances analysis,

10

based on the unique facts and circumstances of each case." *McDonnell*, 484 Md. at 80 (citing *Missouri v. McNeely*, 569 U.S. 141, 150 (2013)). "Evidence obtained in violation of the Fourth Amendment will ordinarily be inadmissible under the exclusionary rule." *Richardson*, 481 Md. at 446. Yet the "significant costs" of the exclusionary rule warrant limiting its application to cases "where its deterrence benefits outweigh its substantial social costs." *Id.* (quotation marks and citations omitted).

"Under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions [not applicable here], a warrantless search or seizure that infringes upon the protected interests of an individual is presumptively unreasonable" so that "absent a showing of probable cause, [it] violates the Fourth Amendment." *In re D.D.*, 479 Md. 206, 223 (2022) (quotation marks and citations omitted). Likewise, under Maryland Code, § 2-202(c) of the Criminal Procedure Article, a police officer may make a warrantless arrest upon "probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer." *See also Maryland v. Pringle*, 540 U.S. 366 (2003) (recognizing that an officer may make a warrantless arrest of a person in a public place if supported by probable cause).

The objective standard for probable cause to arrest is whether "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Rovin v. State*, 488 Md. 144, 183 (2024) (quotation marks and citations omitted). *See also*

11

*Brown v. State*, 261 Md. App. 83, 94 (2024). To determine whether police had probable

cause for an arrest, "we examine the events leading up to the arrest, and then decide whether

these historical facts, viewed from the standpoint of an objectively reasonable police

officer, amount to probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 56-57

(2018) (quotation marks and citations omitted).

> When evaluating events and information using a probable cause calculus, both
>
> > [t]he United States Supreme Court and [the Maryland Supreme] Court have recognized "that a police officer may draw inferences based on his own experience in deciding whether probable cause exists." Such "inferences . . . and deductions about the cumulative information available to [police officers] . . . 'might well elude an untrained person.'" Indeed, "[a] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer."
> >
> > It is, moreover, a "basic and well-established principle[ ] of law" that courts reviewing a probable cause determination are not to view each fact "in isolation," but rather "as a factor in the totality of the circumstances." The obligation to review a probable cause determination in light of the totality of the circumstances "precludes" a "divide-and-conquer analysis."

*State v. Johnson*, 458 Md. 519, 534-35 (2018) (citations omitted). "[T]he relevant inquiry

is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that

attaches to particular types of noncriminal acts[,]" because probable cause "'requires only

a probability or substantial chance of criminal activity, not an actual showing of such

activity.'" *Wesby*, 583 U.S. at 57, 61 (additional quotation marks omitted) (quoting *Illinois*

*v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)). *See Brown*, 261 Md. App. at 94-95.

**(iii)**

The primary issue in this case is whether probable cause existed to support the appellant's arrest approximately twenty-four hours after the homicides. More specifically, was the information known to the arresting officers, most of which came from the anonymous 911 call, trustworthy and such that an officer reasonably could have believed that the appellant had committed particular crimes, namely shooting and killing Palmer, Stewart, or both, and driving the getaway car?

Our analysis starts with the suppression court's factual findings, which, viewing the evidence in the light most favorable to its ruling, are as follows. Virtually contemporaneous with the shootings, a witness who heard the shots saw two African American men run to a white car, get in, and drive away. The witness then saw a man inside a parked car who had been shot. As the events were unfolding, the witness called 911, anonymously, and reported these facts. The witness gave the 911 operator the license plate number of the white car the men ran to and drove away in. Using that information, the police determined that the appellant was the registered owner of the white car, a Subaru Legacy. In an effort to locate the Subaru, the police distributed a flyer with photographs and information about it. Roughly twenty-four hours after the shootings, police in a helicopter located the Subaru being driven to the Giant Food parking lot, not far from the scene of the shootings. The driver parked the car, entered, and exited the store. As he was approaching the Subaru in the lot, he was intercepted by the police and, in response to being asked his name, identified himself as the appellant. The presence of the key fob for the Subaru in the appellant's

13

pocket confirmed what the police had seen, that he had driven the Subaru to the Giant Food parking lot.

The suppression judge credited the first-level facts, in part because she determined that the 911 caller was reliable, a topic we shall address next. The facts plainly were supported by the evidence, and were not clearly erroneous. The judge also drew two significant inferences from the first-level facts. First, and contrary to an argument advanced by defense counsel and repeated on appeal, the two men seen running to the white car immediately after the shootings probably were the shooters making their getaway, not innocent bystanders. And second, the man who drove the white car away probably was its owner, the appellant, making him one of the shooters. Both inferences were reasonable.

The 911 caller made no mention of other people being present or other vehicles being driven away. She showed an awareness of the residential area in which the shootings happened. She focused on the white car, taking down its license plate number and reporting it to the 911 operator. Given that she was calling 911, she would not have drilled down on identifying information about that particular vehicle unless she thought that the men who ran to it and drove off were involved in what she knew, from seeing a body in a parked car, was an extremely serious crime. Common sense would dictate that perpetrators of a shooting would try to leave the scene as quickly as possible, which, if they had a vehicle, would include running to it and driving away.

It also was reasonable to infer that the person who drove the car from the scene was its owner. The United States Supreme Court recognized this in *Kansas v. Glover*, 589 U.S. 376 (2020). There, a patrolling officer ran a license plate check on a pickup truck he saw a

14

person driving. The check showed that the model of the truck matched the vehicle he was watching, and the owner of the truck had had his driver's license revoked. The Court reasoned that these facts supported the "commonsense inference that [the owner] was likely the driver of the vehicle," which gave the officer reasonable suspicion to effect a traffic stop. *Id*. at 381. The Court also commented that absent information negating the inference that the owner is the driver, the inference stands.

There is ample basis in the evidence to support the suppression court's factual findings and to give due weight to its reasonable inferences. Only if the anonymous 911 call were not a reliable source of information would we conclude otherwise.

**(iv)**

Whether an anonymous tip to the police is reliable has been considered in cases addressing reasonable suspicion to support a stop, including a traffic stop, and in other cases addressing probable cause to arrest or to search.[7] Although differing analyses apply to those standards, courts have used similar reasoning in deciding whether a tipster's information was sufficiently trustworthy for the police or a magistrate to act on it.

---

[7] "[R]easonable suspicion [to support a stop is] 'a particularized and objective basis' for suspecting the person stopped of criminal activity[.]" *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Probable cause that will support an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). And probable cause to support a search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Ornelas*, 517 U.S. at 696.

Generally, known informants are considered more reliable than anonymous ones. *See Adams v. Williams*, 407 U.S. 143, 146-47 (1972) (information from known informant was sufficiently reliable to provide reasonable suspicion to support stop and frisk under *Terry v. Ohio*, 392 U.S. 1 (1968)). Unlike a truly anonymous source of information, the police can assess the reputation of a known informant and the informant "can be held responsible if her allegations turn out to be fabricated[.]" *Florida v. J.L.*, 529 U.S. 266, 270 (2000). However, when information imparted anonymously bears sufficient indicia of reliability under the totality of the circumstances, both "in its tendency to identify a determinate person" and "in its assertion of illegality," that information may be considered in assessing whether police have grounds for a Fourth Amendment search or seizure. *Id.* at 272. Fourth Amendment jurisprudence teaches that to pass the reliability threshold, information from an anonymous source must be sufficiently particularized, pointing to a specific person committing a specific crime based on knowledge specified by the source. *See id.*

Of course, anonymous tips can come from a variety of sources and can involve numerous scenarios. Some tipsters call the police; others write letters. Still others use the 911 system, as in this case. The scenarios in some cases involve anonymous tipsters found to be reliable because they gave the police detailed information about crimes to occur in the near future, which then unfolded exactly as predicted. *See, e.g.*, *Alabama v. White*, 496 U.S. 325 (1990) (in anonymous telephone call to police, tipster predicted that defendant would leave particular apartment at particular time, in vehicle precisely described, with cocaine in a briefcase, and would drive to a particular motel to effectuate a drug transaction;

16

the predicted activity was observed by the police, up to a time soon before the drug deal, and the defendant was found with drugs in her possession); *Gates*, 462 U.S. 213 (in anonymous letter to police, tipster predicted that the defendants, a married couple, would separately travel from Chicago to West Palm Beach, on specific dates and by independent means of transportation, reconnoiter to pick up their drug supply, and return to Chicago separately with drugs in one defendant's car; after the predicted behavior was witnessed by federal agents, a search warrant for the car was issued and the warrant later was held to have been supported by probable cause).

Scenarios in other cases have involved reports by victims or witnesses of crimes as they unfolded or immediately thereafter. In *Navarette v. California*, 572 U.S. 393 (2014), the United States Supreme Court held that, considering the totality of the circumstances, an anonymous call to 911 from the victim, who witnessed the crime committed, was sufficiently reliable to support a vehicle stop. The victim called 911, reporting that a silver Ford F-150 pick-up truck with a specific license plate number had just run her vehicle off the road. She gave the 911 operator the location at which the event had happened. Thirteen minutes after the 911 call was broadcast to highway patrol, an officer spotted the truck with that license plate on the highway and effected a traffic stop. As he approached the truck on foot, he smelled marijuana. A search of the truck revealed thirty pounds of marijuana inside. The issue was whether there was reasonable suspicion of criminal activity to support the traffic stop.

The Supreme Court concluded that the 911 call "bore adequate indicia of reliability for the officer to credit the caller's account[,]" and therefore the officer was justified in

17

stopping the truck based on reasonable suspicion of dangerous driving. *Id*. at 398-99. Factors giving "significant support to the tip's reliability" and "indicator[s] of veracity[,]" were that the caller had "eyewitness knowledge" of the events, and that 911 calls are not truly anonymous because features of the 911 system allow authorities to identify and trace all callers. *Id*. at 399-400. In addition, a "contemporaneous report [of a crime] has long been treated as especially reliable." *Id*. at 399. The Court held there was sufficient indicia of reliability to generate reasonable suspicion for the traffic stop. *Id*. at 401.

Prior and in contrast to the decision in *Navarette*, in *Florida v. J.L.*, 529 U.S. 266, the Supreme Court held that the information received from an anonymous caller to 911 was not sufficiently reliable to support a stop and frisk of the defendant. That tip was not an eyewitness account of illegal behavior, as in *Navarette*, nor did it predict illegal conduct, as in *White*. The caller simply reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id*. at 268. Two responding officers saw three black males at that location, one of whom was wearing a plaid shirt. The officers did not see a firearm and the man in the plaid shirt did not make any threatening or unusual movements that would suggest he was carrying a firearm. An officer stopped and frisked him and found a gun in his pocket. The issue was whether the anonymous caller to 911 was reliable and provided sufficient information to support a *Terry* stop and frisk.

In answering that question in the negative, the Court pointed out that the anonymous 911 caller did not provide predictive information and there was nothing to indicate the caller had "knowledge of concealed criminal activity." *Id*. at 268, 271-72. The recording of the 911 call was not moved into evidence at the suppression hearing. The Court

18

concluded that the caller's mere general description of a person's clothing was not a sufficiently reliable predicate for a Fourth Amendment intrusion. *Id*. at 272. *See also Mack v. State*, 237 Md. App. 488, 500-02 (2018) (holding that anonymous 911 tip that two black men, one wearing a blue jacket and another wearing a gray jacket, were selling drugs, was not a sufficiently reliable basis to stop and seize the defendant[8]); *Ames v. State*, 231 Md. App. 662, 665, 670 (2017) (holding that anonymous call that "a black man 'wearing dark grey sweatpants and a Chicago Bulls hat' was standing in front of" a specific building "with a gun in [his] waistband" did not constitute reasonable suspicion to stop because the tip lacked "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions . . . not easily predicted" (cleaned up)); *United States v. Brown*, 401 F.3d 588 (4th Cir. 2005) (anonymous telephone call that a short, black man wearing glasses was carrying a handgun outside a particular apartment complex was not sufficiently particularized to support reasonable suspicion sufficient for a *Terry* stop and frisk).

More recently, in *Trott v. State*, 473 Md. 245, 250 (2021), our Supreme Court held that "an anonymous 911 call . . . that provided the specific location and license plate of a

---

[8] We emphasized in *Mack* that the State's failure to introduce the 911 call into evidence diminished its value; and we cautioned that

> it would behoove the State, when relying on . . . anonymous 911 tip[s], to produce the recording (or explain its absence) and give the suppression court the ability to listen to the conversation – *all* the information supplied by the caller and not just what the police dispatcher relayed to the patrol officers – in order to make a more informed judgment regarding its reliability.

*Mack v. State*, 237 Md. App. 488, 502 (2018) (emphasis in original).

19

vehicle driven by a possibly intoxicated driver" was sufficiently reliable to support a traffic stop. "[W]ithin minutes of the call, the responding police officer located the vehicle in a parking lot of a liquor store, and knocked on the window of the running car to investigate." *Id*. The Court observed that "[t]he tip was contemporaneous to the reported behavior and provided detailed and specific information[,]" leaving "no question that the dispatch described the motor vehicle with sufficient particularity such that [the police officer] could be certain that the vehicle he stopped was the same one identified by the caller." *Id*. at 266. Beyond establishing the reliability of that identifying information, "[t]he caller's use of the 911 emergency system to report intoxicated driving also bears favorably on the tip's veracity[,]" *id*. at 267, because "although conclusory, an allegation that a person is intoxicated is the kind of shorthand statement of fact that lay witnesses have always been permitted to testify to in court." *Id*. at 266 (quotation marks and citation omitted). Generally, information reported in a 911 call "bears favorably on the tip's veracity":

> As the Supreme Court observed in *Navarette*, "911 calls can be recorded" and the Federal Communications Commission ("FCC") not only requires cellular carriers to relay caller phone numbers to 911 dispatchers but also requires carriers "to identify [a] caller's geographic location with increasing specificity." These features that are designed to better identify 911 callers, coupled with the State criminalizing knowingly false reports of criminal activity, *see* Maryland Code, Criminal Law § 9-503, would make "a reasonable officer . . . conclude that a false tipster would think twice before using" 911 to report a phony tip.

*Id*. at 267 (citations and footnote omitted).

As in *Navarette* and *Trott*, the 911 caller in the case at bar gave a firsthand and contemporaneous report of an ongoing public safety emergency requiring an immediate police response. She heard shots ring out and then saw two men run to a white car and drive

20

off. Thus, she was an auditory witness to the shootings and a visual witness to two men running to a particular vehicle. As we see it, she had firsthand knowledge of events and was "'a witness to criminal activity who act[ed] with an intent to aid the police in law enforcement because of h[er] concern for society or for h[er] own safety.'" 2 Wayne R. LaFave, *Search and Seizure: A Treatise On the Fourth Amendment*, § 3.4(a) (6th ed. Nov. 2024 update) (hereinafter "LaFave") (quoting *State v. Paszek*, 50 Wis. 2d 619, 630 (1971)). The 911 caller precisely described the location of the white vehicle she saw the two men running to, described the men, gave the color and license plate number of the vehicle, detailed the path it took out of the neighborhood, and reported a "guy was shot" in a car stopped on the street. The information she gave established her close proximity to the crime scene. It was evident that the caller was trying to give precise details of where the men had driven so the police could find them. And, as the Courts in *Navarette* and *Trott* explained, despite the caller's request for anonymity, her use of the 911 system meant that her phone number and location were ascertainable.[9] In turn, that number and location information, "coupled with the State criminalizing knowingly false reports of criminal activity," supports a reliability inference that the 911 caller was not likely to make a false report. *See Trott*, 473 Md. at 267. Finally, the 911 call was played at the suppression hearing, allowing

---

[9] *See* Md. Code, § 1-301(h) of the Public Safety Article ("PS") (defining "[e]nhanced 9-1-1 system" to mean one providing "automatic number identification;" "automatic location identification;" and "other technological advancements" that may be required); PS § 1-304(a) (providing that "[e]ach county shall have in operation an enhanced 9-1-1 system").

the court to assess the caller's state of mind and ability to relay the details of what she heard and saw.

The particularized facts given to the 911 operator "lends credence to the notion that the caller reported an ongoing crime as it happened[,]" which, as noted, "has long been treated as especially reliable[.]" *Id.* at 266 (quotation marks and citation omitted). *See also Mack*, 237 Md. App. at 500 (noting that it is not just the fact that a tip is made through a 911 call "but also that the caller's report indicated personal knowledge of the alleged violation of law"). In our view, the holdings in *Navarette* and *Trott* strongly support the conclusion that the anonymous 911 call in this case was a reliable source of information for the police to use in deciding to arrest the appellant in conjunction with the shootings of Palmer and Stewart. Given the totality of these circumstances, the suppression court did not err in finding that the anonymous 911 call constituted reliable evidence to support the appellant's Fourth Amendment seizure.

**(v)**

We now turn to the question of whether the facts adduced at the suppression hearing, including the contents of the reliable anonymous 911 call, established probable cause to arrest the appellant when the arrest took place. The appellant argues that when he was arrested, all the police knew was "that his car was seen near a shooting" the day before, information he maintains fell short of probable cause to arrest. He concedes that "911 calls that identify specific vehicles" by license plate number "can sometimes give rise to probable cause for arrests[,]" but maintains that cases in which that has happened feature callers who "either saw the crime unfold or the vehicle's direct connection to it" and

22

therefore were predicated on "critical additional facts that make the probable-cause determination an easy one[.]" He asserts that the information the 911 caller provided did not amount to probable cause because she did not actually say that the two men she saw running to the car were the shooters rather than mere bystanders "running (naturally) from an area where shots rang out." He maintains that, at best, the police had reasonable suspicion to stop him for questioning as a "person of interest."

As noted, probable cause to justify a warrantless arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "In describing probable cause, the [United States] Supreme Court has 'rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach.'" *Pacheco v. State*, 465 Md. 311, 324 (2019) (quoting *Robinson v. State*, 451 Md. 94, 110 (2017), in turn quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). Probable cause is a "nontechnical conception" that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 231 (quotation marks and citations omitted). Because it "is a fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts[,]" *id.* at 232, it is "'incapable of precise definition or quantification into percentages[.]'" *Rovin*, 488 Md. at 183 (quoting *Pringle*, 450 U.S. at 371). The probable cause standard does not set a "high bar" for police. *Johnson*, 458 Md. at 535 (quotation marks and citation omitted). Although arresting officers must

23

have "more than bare suspicion[,]" *Freeman v. State*, 249 Md. App. 269, 275 (2021) (quotation marks and citation omitted), they need not establish guilt beyond a reasonable doubt or by a preponderance of the evidence, but only a "fair probability" or "substantial chance" of criminal activity by the arrestee. *Gates*, 462 U.S. at 235, 243 n.13, 246. *See Brown*, 261 Md. App. at 94-95.

We begin by disposing of the appellant's arguments that run contrary to the suppression judge's non-clearly erroneous factual findings, which we credit, and the reasonable inferences she drew from them, to which we give due weight. As already discussed, those reasonable inferences were that the two men seen running to the white car right after the shots were fired probably were the shooters. In the judge's exact words, her "take on that 911 call was that [the] caller was saying that the shooter – shooters got into that car." The appellant's car was not merely seen in the vicinity of a shooting, as the appellant would have it. Accordingly, we start from the factual premise that the 911 caller was an eyewitness to two people who probably were the shooters running to a white car bearing a particular license plate number and driving away in that car.

In explaining what constitutes probable cause, Professor LaFave has commented that "because vehicles may usually be more precisely described than people[,]" "[i]f a victim or witness [to a crime] is . . . able to give some description of the vehicle in which the . . . offenders escaped, this substantially increases the chances that probable cause will exist." *LaFave*, § 3.4(c). Importantly, Professor LaFave has honed in on license plate numbers as vehicle identifiers, saying:

> The clearest case, of course, is when the license number of the vehicle is provided; when such occurs, there will almost inevitably be probable cause without regard to the other circumstances of the case.

*Id.* (footnotes omitted). Professor LaFave offers several examples of the police having probable cause to arrest when a vehicle involved in a crime was identified by license plate number: *People v. Edwards*, 836 P.2d 468 (Colo. 1992) (when license plate number and description of one occupant of the car matched descriptions given about armed robbery forty minutes earlier, there was probable cause to arrest); *State v. Dennis*, 189 Conn. 429 (1983) (when eyewitness described two robbers and gave the license plate number of the vehicle they used, police had probable cause to arrest people exiting that vehicle an hour later); *McCary v. Commonwealth*, 228 Va. 219 (1984) (probable cause to arrest defendant for robbery when, two hours after robbery took place, police found parked vehicle fitting description of getaway car and one of two license plate numbers reported); *Webb v. State*, 760 S.W.2d 263 (Tex. Crim. App. 1988) (when citizen gave license plate number of car involved in robbery and said it was down the street, probable cause existed to arrest driver).

A Maryland civil case for false arrest and other torts against members of the Harford County Sheriff's Department comports with Professor LaFave's commentary about the importance of license plate numbers of involved vehicles to the existence of probable cause to arrest. In *Hines v. French*, 157 Md. App. 536 (2004), a 911 operator received a report one evening that a Dodge truck with a particular license plate number had been involved in a personal injury accident at the intersection of Route 40 and Mohrs Lane and had left the scene. That information was relayed to the Sheriff's Department. Later the same evening, a deputy saw that truck driving on Route 40 and effected a traffic stop. The truck

25

was being driven by the plaintiff, its registered owner. The deputy arrested her for violating Maryland Code, § 26-202(a)(3)(vi) of the Transportation Article ("TA"), which criminalizes causing or contributing to an accident resulting in bodily injury or death. As it turned out, her truck had not been involved in the accident. The issue on appeal was whether the deputy had legal justification for the arrest. Answering in the affirmative, we explained that the deputy had probable cause to believe that the plaintiff had violated TA § 26-202(a)(3)(vi), and therefore the arrest was justified.

In *Hines* and most of the cases cited above, the arrest was carried out at most within a few hours of the crime. In the case at bar, the police knew in short order that the likely shooters were two African American men wearing light colored clothing who fled the scene in a white car displaying a particular license plate number and leaving the neighborhood by a particular route. The 911 caller's information closely associated the vehicle with the shootings. Had the police spotted and stopped a white car bearing that license plate number within a few hours of the shootings, there would be little argument that probable cause to arrest the occupants did not exist. The question becomes whether there was probable cause to arrest the owner of that same vehicle twenty-four hours later. By then, the police investigation had identified the appellant as the registered owner of the vehicle connected to the shootings, the appellant was seen approaching the vehicle, and the appellant had identified himself to the police, thus confirming that he was the vehicle's owner.[10] It was

---

[10] The appellant is African American. The evidence does not reveal what he was wearing at the time of the arrest, but as it was the day after the shootings, it was likely he would have changed his clothes from the day before.

26

obvious that the Subaru had not been stolen, given that it was in the appellant's possession; and there was no one else with him, so it also was obvious that he had driven the car to the Giant Food parking lot, as the police helicopter had surveilled him doing, and as was corroborated by his possession of the key fob.

*United States v. Martin*, 28 F.3d 742 (8th Cir. 1994), is somewhat instructive. A store owner was robbed of his wallet, containing five dollars and some blank checks, on the street in front of his establishment. He described his assailant as a white man with brown hair, in his late twenties, five feet ten inches tall, and "clean cut." The next day, a businessman reported the license plate number of a van he had seen idling unattended near the location of the robbery. In addition, the police learned that a white man had cashed two of the victim's checks at a convenience store. The store clerk said the man was driving a van similar in description to the one spotted by the businessman, but the clerk did not see the van's license plate. The police determined from the license plate number that the defendant was a registered owner of the van reported by the businessman. Four days after the robbery, the police found the defendant in his van and arrested him in connection with the robbery.[11]

On appeal, the court held the arrest was supported by probable cause. Unlike the case at bar, where the white car with a particular license plate was closely tied to the probable shooters by an eyewitness, in *Martin*, the van in question only was brought to the

---

[11] In *Martin*, the defendant's wife also was a registered owner of the van, and the police took the extra step of contacting her and determining that he had been in sole possession of the van for weeks. In the case at bar, the appellant was the sole registered owner of the Subaru.

27

attention of the police the next day, and was not tied directly to the robbery by an eyewitness. A similar looking van, not identified by license plate number, was described by the store clerk who witnessed a white man cashing the stolen checks, thus increasing any connection between the van identified by the businessman and the crime. The connection between the van and the crime was not as strong as the connection here, however, and several days, not one, passed between that information being gathered and the arrest. The description of the suspect in *Martin* was more detailed than the description of the shooters here, although the appellant fit within its vague parameters. In both cases, a vehicle was the essential piece of evidence supporting probable cause, and in neither case did the information about the vehicle grow stale or weaken so as to undermine probable cause.

We conclude that the passage of twenty-four hours from the time of the shooting to the time of the appellant's arrest did not diminish probable cause in this case. When the appellant was arrested, the police had reliable information from the 911 caller that the car the likely shooters ran to and drove off in had a particular license plate number; that the appellant was the registered owner of the car bearing that license plate number; that the car was the same color as the car described by the 911 caller; that the next day, the appellant was seen in a parking lot near the identified car and only blocks from the shooting; and that the appellant acknowledged the car was his. A police officer considering all this information reasonably could believe that the appellant was one of the men who shot Palmer and Stewart and then fled the scene in the vehicle he owned. This evidence was sufficient to establish probable cause to arrest the appellant.

28

Nevertheless, the appellant maintains that, because in some cases where probable cause has been found the police had what he characterizes as more evidence of guilt than was present here, the evidence here was insufficient to establish probable cause. Among the cases he cites is *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007), where the police responded to an anonymous 911 call that four black males were loading guns into a large, white SUV parked behind a gas station/convenience store across the street from a bank. The police had been investigating a series of recent armed bank robberies in that area in which three to four black males in a large SUV had entered banks armed with assault rifles. As the police arrived at the scene, the men got in the SUV, drove to the gas pumps, and three, including the defendant, got out to go to the convenience store. The police stopped the SUV and the men and ran criminal background checks, which showed that the defendant had a prior conviction for bank robbery, for which he was on parole. Suspecting there were weapons in the SUV, the police arrested him for being a felon in possession. At almost the same time, an armored truck pulled up to the bank and guards started loading it with satchels of money. On appeal after conviction, the court held that there was reasonable suspicion to stop the SUV and probable cause to arrest the defendant.

As is evident, *Lindsey* bears little resemblance to the case at bar. The appellant asserts that, in this case, the police did not have evidence that he had a record or that similar crimes had been happening in the neighborhood. But *Lindsey* concerned the arrest of a defendant on evidence pointing to the likelihood that he was about to commit a crime –

which made his past conviction and the preexisting investigation into bank robberies critical – not an arrest based on evidence that he already had committed a crime.[12]

The multiplicity of variables that can come into play in assessing probable cause accounts for why the United States Supreme Court describes probable cause as a "non-technical conception" and a "fluid concept" that cannot be determined by "rigid rules" and "bright-line tests"; and instead of applying a rote formula, practically assesses the totality of the circumstances in evaluating whether probable cause exists. To be sure, in some of the cases the appellant points out, there are factors favoring probable cause, such as a vehicle matching a description being stopped soon after the crime was committed and close to the location of the crime, that are not present here. *See, e.g.*, *Commonwealth v. Pryor*, 253 A.3d 299, *5 (Pa. Super. Ct. 2021);[13] *see also Hutto v. State*, 114 So. 3d 802, 808 n.3

---

[12] The appellant also offers *Trott v. State*, 138 Md. App. 89 (2001), as an example of there being additional evidence to support an arrest, namely that when the officer involved asked the defendant his name, upon seeing him pushing a woman's bicycle and carrying random items at 3:00 a.m. in a residential area, he recognized the name as someone involved in break-ins in the past. The officer called for back-up and was told that the defendant likely would become agitated and combative and would try to run. The officer placed him in handcuffs. He then learned that there was an open warrant for his arrest, and placed him under arrest. This Court held that the officer's initial approach was an accosting, not a stop, and even if it was a stop, it was supported by reasonable suspicion. *Trott* is not remotely similar to the case at bar. Nothing in it suggests that the officer in the case at bar needed additional information, such as a history of the appellant being involved in shootings, to arrest him.

[13] This opinion bears the designation "non-precedential" under Pa. Super. Ct. I.O.P 65.37, which follows Pennsylvania Rule of Appellate Procedure 126. At (b)(1), that Rule makes unpublished memorandum decisions of the Pennsylvania Superior Court filed after May 1, 2019 non-precedential, but provides, at (b)(2), that they may be cited for persuasive value. Under Maryland Rule 1-104(b), an unpublished opinion of a court in a jurisdiction other than Maryland "may be cited for persuasive authority if the jurisdiction in which the

(continued…)

(Miss. Ct. App. 2013) (victim recognized the defendant, a customer, as the robber and the defendant's car matched a description of the getaway car); *Barber v. State*, 2010 Ark. App. 210 (2010) (match between witness descriptions of the getaway driver's car by appearance and route); *Commonwealth v. Perry*, 334 Pa. Super. 495, 498-99 (1984) (probable cause to arrest driver of getaway vehicle when victim of service station robbery saw robber get in passenger side of vehicle, described its type, color, and probable make, vehicle was spotted seven minutes after robbery, vehicle was being driven on road victim had reported vehicle left on, and passenger met general description of robber).

This does not mean that, in the absence of these variables, probable cause does not exist here, where an additional variable – a license plate number – exists. Nor does it mean that the absence of an additional variable always operates against probable cause being found. In *People v. Lopez*, 553 N.Y.S.2d 330 (1990), for example, which the appellant cites, the defendant and others matching the description of armed robbers in a neighboring borough were found in a car that matched the license plate and color of the getaway vehicle. The proximity in time of the arrest and the matching descriptions of the robbers are factors not present in the case at bar. The presence of those factors may make that case an even stronger example of probable cause than this one but does not negate probable cause in this

---

opinion was issued would permit it to be cited as persuasive authority or as precedent." *Pryor* is not a memorandum opinion and even if it were, it could be cited for persuasive authority pursuant to the applicable Pennsylvania Rule. We note that the case was cited by the appellant in his reply brief, for persuasive authority only; the information given in this footnote should have accompanied the citation.

case.[14] Each case must be assessed on its own evidence, viewed as a whole under the totality of the circumstances. We hold that the evidence adduced at the suppression hearing, considered under the proper standard for assessing probable cause, supported the suppression court's finding that the appellant's arrest was based on probable cause.

## II.

## Jury Instruction

After being arrested on the evening of August 6, 2021, the appellant was transported to the station house, where he waited for several hours before being interrogated by Detective Seong Koo. Sergeant Sufian Hassan was present as well. The interrogation took place on August 7 at 12:31 a.m. and was videotaped. It lasted fifteen minutes.

After establishing basic information, such as name and birthdate, Detective Koo asked the appellant to tell him what happened when he was arrested. The appellant said he had driven his Subaru to the Giant, but he lets "[f]riends" drive his car and "leave[s] [his] keys out." At the mention of the police having seen a gun in his car, he denied owning any guns or knowing how a gun would have gotten there. When Detective Koo more specifically referred to the Ruger later recovered from the Subaru, pointing out that a gun "was sticking out from underneath the seat" so the police could see it just by "peeking in

---

[14] The appellant also argues that, because several of the cases the State relies upon concern reasonable suspicion, they are inapposite. The reasonable suspicion cases are cited primarily on the issue of reliability of the anonymous 911 caller's information. It must be noted, however, that in many cases, courts are assessing for reasonable suspicion because the government intrusion involved, such as a stop, only required reasonable suspicion. The fact that a given set of circumstances supports a finding of reasonable suspicion does not necessarily mean that it would not support a finding of probable cause, if probable cause were the relevant standard.

32

the car's window[,]" the appellant simply said, "Mm-hmm." At that point, Detective Koo asked, "If you want, we can stop, and you can talk to a lawyer?" The appellant did not say anything about wanting a lawyer and continued to talk, saying, "I mean, if I knew who did it, I would have been telling you." He then recounted his activities on the day of the shootings, saying that he went to work, came home, and around 8:00 p.m. drove his Subaru to Towson to get something to eat. He was accompanied by "a girl." Detective Koo asked for her name and at first the appellant offered to "get her number out of the phone." The appellant then asked, "Can I get an attorney? I'm done." Detective Koo responded, "That's fine, we'll get you an attorney[,]" and the interrogation stopped.

Thus, in his videotaped statement, the appellant denied knowing who had committed the shootings, said he and the Subaru were in Towson (which is not near the location of the shootings) at 8:00 p.m. on August 5, 2021, claimed he often let other people use his car, and said he did not know how a gun came to be under the driver's seat of his car. At trial, however, the appellant testified that he was present at the crime scene, shot both victims, and took the gun belonging to one of the victims (the Ruger). Because the appellant's trial testimony was inconsistent with his videotaped statement, the State sought to impeach him by calling Detective Koo (by then Sergeant Koo) and playing the videotaped statement, with the jury receiving a limiting instruction that the statement only could be used for impeachment. Defense counsel suggested that the parties simply stipulate that Sergeant Koo could "say what [the appellant] said" because "[t]here's not really a dispute about what he said." Before ruling on the State's request to play the videotaped statement, the court asked defense counsel whether any other instructions might be required, given that

33

"you've already acknowledged that there's nothing about the statement that is objectionable." Defense counsel responded, "Yeah, I think . . . we don't have a Miranda issue, and again, I don't think there's a voluntariness issue." The court allowed the State to call Sergeant Koo and play the videotaped statement. A limiting instruction was given at the close of the evidence, with the other instructions.[15]

Notwithstanding defense counsel's earlier remark, at the close of evidence, he requested pattern jury instruction MPJI-Cr 3:18, concerning voluntariness of a defendant's statement.[16] The trial court declined, citing the appellant's failure to file a pretrial motion

---

[15] The limiting instruction told the jurors they could consider the appellant's statement "only to help you decide whether to believe the testimony that the Witness gave during this trial."

[16] MPJI-Cr 3:18 STATEMENT OF DEFENDANT, provides as follows:

You have heard evidence that the defendant made a statement to the police about the crime charged. . . . [The State must prove] beyond a reasonable doubt that the statement was voluntarily made. A voluntary statement is one that under all circumstances was given freely.

[[To be voluntary, a statement must not have been compelled or obtained as a result of any force, promise, threat, inducement or offer of reward. If you decide that the police used [force] [a threat] [a promise or inducement] [an offer of reward] in obtaining defendant's statement, then you must find that the statement was involuntary and disregard it, unless the State has proven beyond a reasonable doubt that the [force] [threat] [promise or inducement] [offer of reward] did not, in any way, cause the defendant to make the statement. If you do not exclude the statement for one of these reasons, you then must decide whether it was voluntary under the circumstances.]]

In deciding whether the statement was voluntary, consider all of the circumstances surrounding the statement, including:

(1) the conversations, if any, between the police and the defendant;

(continued…)

to suppress the statement, counsel's express acknowledgement that the statement was voluntarily given, and the limited purpose for which the statement was admitted.

On appeal, the appellant contends "[t]he trial court abused its discretion in refusing to instruct the jury on the voluntariness of [his] post-arrest custodial statement" and maintains the requested instruction "was right on the law, supported by the facts, and not otherwise covered by the rest of the instructions." The State counters that the trial court did not abuse its discretion by refusing to grant the requested instruction because there was no evidence that the appellant's statement to the police was involuntary; and if there was any error, it was harmless "because the other evidence of his guilt was overwhelming[.]"

Addressing an analogous voluntariness challenge in *Zadeh v. State*, 258 Md. App. 547, 604 (2023), we summarized the principles and procedures that govern our resolution of this appellate challenge:

(2) [whether the defendant was advised of (pronoun) rights;]
(3) the length of time that the defendant was questioned;
(4) who was present;
(5) the mental and physical condition of the defendant;
(6) whether the defendant was subjected to force or threat of force by the police;
(7) the age, background, experience, education, character, and intelligence of the defendant;
[(8) whether the defendant was taken before a district court commissioner without unnecessary delay following arrest and, if not, whether that affected the voluntariness of the statement;]
(9) any other circumstances surrounding the taking of the statement.

If you find beyond a reasonable doubt that the statement was voluntary, give it such weight as you believe it deserves. If you do not find beyond a reasonable doubt that the statement was voluntary, you must disregard it.

35

The narrow question before us is whether the trial court erred in denying Zadeh's request for the voluntariness instruction. The merits of whether Zadeh's statements were voluntary or involuntary are not before us.

Our analysis, therefore, is shaped mainly by two overarching precepts: (1) that the jury (or factfinder) must determine the voluntariness of a defendant's statement to law enforcement if the issue is generated at trial; and (2) only "some evidence" of involuntariness is required to generate a voluntariness instruction.

First, the voluntariness of a defendant's statement is evaluated under Maryland's "two-tiered approach" articulated in *Hof v. State*, 337 Md. 581, 604 (1995). The first step proceeds before the court and out of the presence of the jury, with the State bearing the burden of proving voluntariness by a preponderance of the evidence. "Courts that are asked to determine at a suppression hearing whether a confession was made voluntarily must examine the totality of the circumstances affecting the interrogation and the confession." If the statement is determined by the court to have been voluntarily given, the issue may proceed to the second tier where it is submitted at trial to the jury, which "has the final determination, irrespective of the court's preliminary decision, whether or not the confession is voluntary, and whether it should be believed." The jury may use the statement in determining guilt, but only if the State persuades the jury of the voluntariness of the statement beyond a reasonable doubt. It is, therefore, a bedrock principle of our jurisprudence that "both the trial court and the jury must pass upon the voluntariness of a defendant's confession."

Second, for a defendant to receive a jury instruction on voluntariness, there must be "some evidence" of involuntariness presented during the trial. *Id*. at 619-20. Our cases stress that only *some evidence* is required, and thus the defendant's burden of production is not onerous:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says – "some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the [involuntariness] claim is overwhelmed by evidence to the contrary.

*Id.* at 603-05 (emphasis in original; citations and footnote omitted).

"Voluntariness" is a defined concept under both federal and Maryland law. As we have explained:

> To be admissible as evidence against a criminal defendant, statements and confessions must be voluntary. To be voluntary, a confession must satisfy the federal and state constitutional requirements, and the Maryland common law rule that a confession is involuntary if it is the product of an improper threat, promise, or inducement by the police.
>
> The constitutional test for voluntariness established by the Supreme Court prohibits confessions that are the result of police conduct that overbear the will of an individual and induces that person to confess. The Maryland common law test similarly looks to "the totality of the circumstances affecting the interrogation and confession," but applies a *per se* rule of exclusion for statements that were "'the product of an improper threat, promise, or inducement by the police.'"

*Covel v. State*, 258 Md. App. 308, 325 (citations and footnote omitted), *cert. denied*, 486 Md. 157 (2023). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." (citations omitted)).

We conclude that the trial court did not abuse its discretion in declining to give the requested voluntariness instruction, for several reasons.

First, the appellant's statement was not admitted to prove guilt. As the jury was told, its use was limited to impeachment, that is, for the jury to assess the appellant's credibility.

37

At trial, he testified that he was present at the scene of the shooting and shot the victims in self-defense and in defense of Griffin. In his videotaped statement, he said he did not know who shot the victims and at 8:00 p.m. on the evening of the shootings, which is about when the shootings took place, he and his car were in Towson. The jurors could consider the disparity between the appellant's statement and his trial testimony in deciding whether to believe his testimony. Md. Rule 5-613(b); *Thomas v. State*, 213 Md. App. 388, 405 (2013) (recognizing this rule "permits impeachment of a witness'[s] credibility by evidence that the witness made a prior statement that is inconsistent with his or her in-court testimony . . . if a sufficient foundation first has been established").

Second, even if the recorded statement were considered for its substance, not for impeachment only (which it should not have been given the court's limiting instruction), the statement was not incriminating.[17] Indeed, it was exonerating. The appellant denied being involved in the shootings, said he would tell the police if he knew who had committed the crimes, and put himself at a location far away from the crime scene. The appellant's recorded statement was *not* a confession. His trial testimony *was* a confession to committing the shootings, with an explanation that he did so in defense of himself and Griffin.

---

[17] The trial court correctly pointed out that the appellant did not move to suppress the statement before trial, which, as we explained in *Zadeh*, is the first step in the two-step process that applies when a defendant is taking the position that his pretrial statement was not voluntary. This is because, until the evidence was closed and instructions were being discussed, the appellant did not take the position that he gave the statement involuntarily.

Even if the statement were a confession, which it clearly was not, it was the appellant's burden to present "some evidence" that it was not voluntarily given, which he failed to do. *See Zadeh*, 258 Md. App. at 604. Although that burden can be satisfied with evidence "emanat[ing] solely from the defendant[,]" *id*. at 605 (quotation marks and citation omitted), and the appellant elected to testify at trial, he did not testify that he was pressured into giving the statement and his will was overborne. *Cf. Lee v. State*, 418 Md. 136, 160 (2011) (noting lack of evidence that detective's "improper comment overbore" defendant's will). Nor is there merit in the appellant's assertion that he was entitled to a voluntariness instruction because of the custodial nature of his interrogation and the fact that it was conducted at a late hour by two police officers. There was no evidence that would allow a reasonable factfinder to find that the physical circumstances of the appellant's interrogation were coercive, nor was there evidence of any promise, threat, improper inducement, or other coercive condition to the interrogation. And the very nature of his statement, exonerating himself, is antithetical to his will being overborne.

The record also refutes the appellant's final assertion that his statement was involuntary because questioning continued after he initially asked, after reading the *Miranda* advisements, "Can I have an attorney?" The transcript makes clear that this was a question about the meaning of the *Miranda* advisements, not a request for counsel. The transcript shows that after an inaudible exchange, the interrogating officers responded that the "last line [of the *Miranda* advisements] just basically is saying that you are agreeing to talk with us without an attorney present[,]" but "you can stop talking at any point," and "[w]e won't ask any questions after that." When asked whether he "want[ed] to read it

39

again[,]" referring to the *Miranda* advisements, the appellant answered, "Can I sign?" and proceeded to do so and to answer questions, without saying that he wanted an attorney present. When, fifteen minutes into the interrogation, the appellant said he wanted a lawyer, questioning was stopped.

For all these reasons, the trial court did not abuse its discretion in refusing to give the requested voluntariness instruction.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**